No. 46,227

RALPH W. FOUTS, d/b/a FOUTS PLUMBING & HEATING COMPANY, *Appellee*, v. ARMSTRONG COMMERCIAL LAUNDRY DISTRIBUTING COMPANY, a/k/a ARMSTRONG-MAYTAG LAUNDRY DISTRIBUTING COMPANY, *Appellant*, and GEORGE E. SYBRANT and BETTY J. SYBRANT, his wife, *Appellees*.

(495 P. 2d 1390)

Opinion filed April 8, 1972.

*Thomas D. Herlocker,* of the firm of Roberts and Roberts, of Winfield, and *Charles W. Stubbs,* of Oklahoma City, Oklahoma, argued the cause and were on the brief for the appellant.

*Donald Hickman,* of the firm of Dale, Hickman and Mills, of Arkansas City, argued the cause and was on the brief for appellees Sybrants.

The opinion of the court was delivered by

KAUL, J.: This action was initiated by plaintiff-appellee, Ralph W. Fouts, d/b/a Fouts Plumbing & Heating Company, to foreclose a mechanic's lien. The principle controversy, however, arises from cross-petitions between defendants-appellees, George E. Sybrant and Betty J. Sybrant, and defendant-appellant, Armstrong Commercial Laundry Distributing Company, a/k/a Armstrong-Maytag Laundry Distributing Company. These parties will be referred to hereafter as Sybrants or appellees and Armstrong or appellant, respectively.

Since the most serious issue on appeal concerns the trial court's denial of Armstrong's request for a continuance; it is necessary to review the history of the litigation.

The dispute arose from an arrangement whereby Sybrants were to furnish and remodel a building owned by them and Armstrong was to furnish laundry equipment to establish a self-operating laundry to be leased for the mutual benefit of both parties.

In 1966 Sybrants acquired the property involved which had been used for many years as a filling station. They had in mind improving it for use as some type of retail outlet. Before they had made any definite plans, Sybrants were approached by Fred Washington, who introduced himself as an agent of Armstrong. Washington presented a proposition for converting the property into a self-service laundry. Mr. Sybrant testified that he told Washington he knew nothing about the laundry business, but that Washington said Armstrong had looked over the site and thought it was excellent for its purposes. Sybrant restated his lack of knowledge about the laundry business; that he knew of similar businesses within the city which had not been successful, and that he doubted the wisdom of the enterprise.

According to Sybrant, Washington responded by stating that his company handled Maytag products throughout the area and had had extensive experience in this type of enterprise; that the location was excellent for such a facility; and further that he had a man, Don Clapsaddle—a building contractor, who had had considerable experience in constructing similar facilities for the Armstrong Company, and that he was an expert in this type of work.

Sybrant advised Washington that he would not be interested in the project unless he was assured of a long-term lease. Negotiations continued for some time and finally culminated in the exe-

cution of a lease between Armstrong and Sybrant, and a building agreement between Sybrant and Clapsaddle. The building agreement was attached to and made a part of the lease by the terms thereof. The building agreement specifically provided for the use of Armstrong blueprints, and an Armstrong ceiling and, further; that the remodeling work and materials should be approved by Fred Washington, as well as Sybrant. The lease and the agreement were executed on July 8, 1966. Under the terms of the building contract, Sybrant was obligated to pay Clapsaddle $3800 upon completion of the work in a workmanlike manner.

Armstrong's operating headquarters were located in Oklahoma City. Clapsaddle worked out of either Claremore or Collinsville, Oklahoma.

Work commenced in the summer of 1966. Difficulties were soon encountered. Sybrants claimed that Clapsaddle negligently failed to perform the contract as agreed; that he caused some of the building walls to collapse; that the roof was substantially damaged in an attempt by Clapsaddle to modify it in order to accommodate a large circulating cooler required by the Armstrong specifications; and that as a result of Clapsaddle's poor workmanship the building was structurally weakened.

Clapsaddle failed to pay several subcontractors and material men and as a result this litigation was initiated by Fouts filing an action to foreclose a mechanic's lien on July 20, 1967.

The Fouts's petition named as defendants the Sybrants, Armstrong, Clapsaddle, Shutlers (mortgagees of the premises), Clarks, who had become tenants, and several other lien holders.

On August 28, 1967, Armstrong filed an answer to plaintiff's petition. Armstrong's answer was signed by Rose McAllister and Charles W. Stubbs, neither of whom were Kansas attorneys.

On August 31, 1967, Sybrants filed their answer to Fouts's petition and a cross-claim against Armstrong and Clapsaddle.

On March 12, 1968, various parties appeared by their attorneys, but neither Clapsaddle nor Armstrong appeared. The record discloses an order of the court made on that date dismissing with prejudice the petition of plaintiff against all parties except Clapsaddle and Armstrong, and also the cross-petitions and cross-claims between other defendants. The last paragraph of the order reads:

"IT IS FURTHER ORDERED AND ADJUDGED, that the plaintiff and the defendants, Sybrant, proceed further herein upon plaintiff's petition and upon said de-

fendants' cross-claim against the defendants, Clapsaddle and Armstrong Commercial Laundry Distributing Company."

At this point in the chronology of the litigation (March 12, 1968) there remained in the action plaintiff's petition against Clapsaddle and Armstrong and Sybrants' cross-claim against Clapsaddle and Armstrong. The record next shows an order of March 25, 1968, striking the matter from the trial docket upon the agreement of the parties. The firm of Janicke, Herlocker and Bishop, of Winfield, appeared as Kansas counsel for the first time representing Armstrong.

On April 8, 1968, Armstrong filed an answer to Sybrants' cross-claim in the form of a general denial and as an affirmative defense alleged that damages suffered by Sybrants resulted from Sybrants' own negligence. Armstrong also filed a cross-claim which alleged that under the lease George Sybrant agreed to pay one-half the cost of carpeting, which he had failed to pay, and was therefore indebted to Armstrong in the amount of $788.62.

On June 3, 1968, the case was set for trial on September 23, 1968, when it was again stricken from the assignment calendar at the request of Armstrong's Kansas counsel.

On April 16, 1969, the case was again set for trial, but was apparently continued because of negotiations for settlement.

On May 16, 1969, the firm of Janicke, Herlocker and Bishop filed a notice and made oral application to withdraw as counsel for Armstrong. The court entered an order approving the withdrawal of counsel and found that notice thereof had been served upon Armstrong and all other counsel of record.

Under Rule No. 122 (205 Kan. L) of this court and the local rules of the District Court of Cowley County, terms of court open on the second Monday in January and March and the first Monday in June and October of each year at which time the entire docket is called for assignment. In this case nothing appears of record from May 16, 1969, until January 12, 1970, when the case was assigned for trial on January 20, 1970.

On January 15, 1970, Charles W. Stubbs, of Oklahoma City, counsel for Armstrong received notice of the setting from the Clerk of the Court. On the same day Mr. Stubbs arranged with Thomas D. Herlocker, of Winfield, to become associated as Kansas counsel for Armstrong.

On January 16, 1970, Mr. Herlocker filed a motion for a con-

tinuance of the trial stating that Oklahoma counsel was unable to attend court on January 20, 1970, and that counsel was unable to notify all witnesses and have them in court for trial on January 20. The motion was heard by consent on January 19, 1970. Counsel for Sybrants appeared and opposed the motion. The court reset the trial for January 21, ruling as follows:

"THE COURT: Gentlemen, it appears to the Court that upon the withdrawal of Mr. Bishop of Janicke, Herlocker and Bishop on May 16, 1969, that Mr. Stubbs did not from then on make any attempt to obtain any knowledge concerning the status of Case 33757 in Cowley County, Kansas; made no attempt to have local counsel at any of the intervening terms between May 16, 1969, and the setting of this case on the opening day of the January Term, 1970, and the Court feels that it's the responsibility of not only local counsel but out of state counsel to comply with the rules of the Court, and more specifically with the rules of the Supreme Court of this state which has established certain term days for the Court to call dockets. This case has been on file since July 20, 1967, which is more than enough time to have done something about the status of it. The Court would, however, reset it for—from tomorrow morning until 1:30 January 21st in order to give you time to inform your counsel in Oklahoma City that it would be set for that date. As a matter of fact, the record does not even reflect that Mr. Stubbs even made any comment or anything else at the time Mr. Bishop withdrew in May of '69. There's no correspondence that the Court finds from Mr. Stubbs or anyone purporting to represent Mr. Stubbs from the time that the order allowing the withdrawal of local counsel was filed and allowed. You may go off the record."

When the case was called for trial at 1:30 on Tuesday, January 21, Mr. Herlocker appeared and orally renewed his motion for continuance. Mr. Herlocker stated that he had received a letter from Mr. Stubbs to the effect that Washington, who was desired as a witness for Armstrong, "was caught in the weather and could not be reached. He has not been contacted." Mr. Herlocker read other excerpts from Mr. Stubbs' letter concerning a case set for trial on January 28 in Oklahoma City, in which Mr. Stubbs was counsel, and also that Mr. Stubbs was scheduled to take depositions and was scheduled for pretrial on January 23. No affidavits or names of witnesses other than Washington were produced or mentioned either by Mr. Herlocker or in excerpts from the Stubbs letter read by Mr. Herlocker.

The trial court overruled the final motion for continuance and the case was called for trial the afternoon of January 21 as scheduled. Mr. Herlocker announced that he was not prepared to participate in the trial and was attending only "as a spectator." Sybrants presented their evidence and the trial court entered judgment in their

favor in the amount of $5000.00 against Clapsaddle and Armstrong jointly and against Armstrong alone in the amount of $250. The court also entered judgment in favor of Fouts against Clapsaddle and Armstrong in the amount of $245.

Armstrong filed a motion for a new trial which was set for evidentiary hearing on February 10, 1970; at which time Mr. Stubbs appeared for the first time. He was presented to the court by Mr. Herlocker, and as a member of the Oklahoma Bar in good standing. Mr. Stubbs was admitted to practice for this case.

After what appears from the record to have been a rather lengthy hearing the motion for a new trial was overruled and this appeal was perfected.

On appeal it is strenuously argued that the trial court erred in refusing a continuance and in denying Armstrong an opportunity to present evidence.

It has long been settled law that the granting or refusal of a continuance rests within the sound judicial discretion of the trial court and its judgment will not be disturbed on appeal in the absence of a clear showing of abuse. (Vols. 1-3 Hatcher's Kansas Digest [Rev. Ed. Perm. Supp.], Continuance, § 1.) This rule is now embodied in K. S. A. 60-240 which fully governs a trial court's authority in the assignment of cases for trial, calendar control and granting of continuances at any stage of the proceedings. (*Pacific Indemnity Co. v. Berge*, 205 Kan. 755, 473 P. 2d 48; and *Scott v. Keyse*, 200 Kan. 625, 438 P. 2d 112.)

As the appellees point out, this court has seldom disturbed a trial court's ruling on a matter for continuance. Appellant cites one Kansas case. (*In re Estate of Bump*, 171 Kan. 442, 233 P. 2d 478.) The judgment in that case, however, was not reversed on the ground of abuse of discretion, but because it was held to be a void judgment. In *Bump* the appeal was from a district court's judgment affirming a probate court's judgment entered by the probate court when, after an indefinite continuance, petitioners appeared and obtained an order and judgment construing a will without notice of any kind to the adverse party.

Our decisions indicate that district courts have broad discretion in matters concerning the assignment of cases for trial and the granting of continuance. (*White v. Southern Kansas Stage Lines Co.*, 136 Kan. 51, 12 P. 2d 713; and *Powder Co. v. Bilby*, 104 Kan. 769, 180 Pac. 735.) This is a necessity in order that district courts may

manage their dockets. While a trial court's discretion is necessarily broad in this area, it is not without limitations and is subject to review. (*Roberts v. Sinkey*, 136 Kan. 292, 15 P. 2d 427.) We view with grave concern the denial of a continuance where the effect for all practical purposes deprives a party of his day in court. In ruling on a motion for continuance under such conditions a court must consider all circumstances, particularly such matters as the applicant's good faith, his showing of diligence, and the timetable of the lawsuit. Discretion is to be exercised in a sound and legal manner and not arbitrarily or capriciously.

Appellant's first pleading in this case was filed on August 28, 1967, by nonresident (Oklahoma) counsel without associate Kansas counsel contrary to K. S. A. 7-104 and Rule No. 109 (205 Kan. xli.) of this court. Appellant's Oklahoma counsel appeared in person before the court for the first time two and one-half years later at the hearing on a motion for a new trial on February 12, 1970. When the case was first assigned for trial on March 4, 1968, the firm of Janicke, Herlocker and Bishop apparently became associated with Oklahoma counsel. Mr. Bishop appeared and was successful in having the trial assigned for March 25, 1968, stricken. On May 16, 1969, the Janicker firm filed a withdrawal which was allowed by the court after finding notice was had on all counsel of record. Appellant made no effort to secure Kansas associate counsel until the notice of assignment was received in January, 1970. On this point, appellant's counsel, Mr. Stubbs, stated in his brief that he heard nothing about the case after September, 1968, notwithstanding the trial court's finding on May 16, 1969, that notice of withdrawal had been served on Mr. Stubbs. Appellees' counsel points out that on the hearing of the motion for a new trial, Mr. Stubbs, in response to a direct question by the court admitted receipt of the notice of withdrawal. On its face the record shows lack of diligence on the part of appellant's Oklahoma counsel.

The history of the instant case vividly demonstrates the purpose of K. S. A. 7-104 and the importance of compliance therewith by a litigant represented by counsel from another state. Members in good standing of the bar of other states are, of course, welcome to appear before the courts, tribunals and agencies of this state, but association with Kansas counsel as provided for in 7-104 and for the reasons stated therein is absolutely essential. (see, also, Supreme Court Rule No. 9 [205 Kan. XXXIII]; *Thornburg v. McClelland,*

186 Kan. 20, 348 P. 2d 617; *Taylor v. Taylor,* 185 Kan. 324, 342 P. 2d 190; and *White v. Southern Kansas Stage Lines Co.,* supra.)

Turning again to the motion for continuance filed by appellant on January 16, 1970, it merely alleged that Oklahoma counsel would be "unable to attend court on January 20, 1970, because of previous court commitments," and that counsel was unable to notify all witnesses and have them in court in time for trial. There were no affidavits of counsel, party or witnesses filed in support of the motion. The nature or whereabouts of counsel's previous court commitments were not explained or specified and no reason given for counsel's inability to notify witnesses. No proof was offered of due diligence or on the unavailability of witnesses.

We find the general rule stated in 17 Am. Jur. 2d., Continuance, § 12:

"In considering applications for a continuance and in inquiring into the grounds thereof, courts generally do not view the absence of counsel with much favor, and, as in any other case, the granting or refusing of the motion rests primarily in the sound discretion of the court, whose ruling will seldom be disturbed in the absence of a clear showing of abuse of discretion. . . ." (p. 129.)

The ruling of the trial court, which we have heretofore quoted, indicates that it was fully apprised of all the circumstances of the case and the previous proceedings and, further; that the court was exercising careful discretion in making the ruling. The fact that the court postponed trial a day and a half until 1:30 p. m. on the 21st negates arbitrariness in the court's action.

We are mindful that the policy of the law favors the hearing of a litigant's claim upon the merits, but from a careful examination of the entire record before us it cannot be said that the trial court abused its discretion under the attending circumstances in the instant case.

Appellant contends the findings and conclusions of the trial court are not supported by the evidence or are contrary to the evidence and the law.

In their cross-petition, Sybrants' claim against Clapsaddle was based on breach of contract and negligence; as against Armstrong their claim was based primarily on representations by and through its agents, particularly Washington that "Clapsaddle was experienced, capable and competent in the renovation, construction and equipment of buildings for use as "help-your-self laundries"—that such representations were relied upon when in truth and in fact

Clapsaddle was inexperienced, incompetent and lacking the capacity to perform such services, all of which Armstrong well knew.

The evidence consisted of considerable testimony by George E. Sybrant and a number of documents including the lease, the contract and various exhibits concerning plans and specifications of materials. At the conclusion of the trial the court made extensive findings. Those which we believe are pertinent to the judgment against Armstrong are:

"III.

"That said Sybrants proposed to improve said real estate by renovation of the improvements for a rental office building, food dispensing, or other retail business until one Fred Washington, employee and agent of the defendant Armstrong Commercial Laundry Distributing Company, hereinafter referred to as Armstrong, came to them and discussed the improvement of the premises for a self-service laundry and dry cleaning establishment. Mr. Sybrant advised Washington that he knew nothing about such an installation, that he knew of other similar businesses within the City which had not been successful, and he was doubtful of the wisdom of such installation.

"IV.

"Washington thereupon advised Sybrant concerning the activities of his employer, Armstrong, stating that it handled Maytag products throughout this area, that he and his company had had considerable experience in this type of work, that this location was believed to be an excellent one for such facility, and that the defendant, Don Clapsaddle, a building contractor, had had considerable experience in building and construction similar installations for his Company, was an expert in this work, and that he could and would obtain Clapsaddle as contractor therefor.

"V.

"Sybrant advised Armstrong, through its agents, that he would not be interested in such improvements unless he was assured that a long term lease, with a responsible leassee, would be entered into with the consideration thereof sufficient to warrant the investment. Negotiations between and among Sybrant and Armstrong then continued culminating in the execution of Building Agreements (Defs.' Exh.), between Clapsaddle and Sybrant, and the Lease (Defs.' Exh.), between Sybrant and Armstrong. The Building Agreement was attached to and made a part of the Lease Agreement. The Building Agreement specifically provided for use of Armstrong blueprints and Armstrong ceiling and provided that the improvement work and materials should be subject to the approval of Fred Washington and Sybrant.

"VI.

"The entire transaction was participated in by Armstrong and Sybrant. The Building Agreement required Clapsaddle to remodel, construct and erect in a good and workmanlike manner in accordance with plans and specifications, made a part thereof, the improvements described therein, but Clapsaddle

negligently, carelessly and in disregard of the terms and conditions set forth in the agreement neglected and failed to perform such services as agreed. Such contractor caused the walls on the building to collapse, the roof was constructed so that rain water was collected thereon, causing it to leak, damaging the ceiling, floorcovering and equipment within the building, the building was made to be out of line and structurally weak, the foundation not true, and Clapsaddle failed and neglected to pay for materials and labor furnished by sub-contractors and finally abandoned the job before completion thereof.

## "VII.

"Sybrant relied upon the representations of Armstrong and its agents as to the efficiency, competency and experience of Clapsaddle to perform the type of construction work involved. The building agreement required Clapsaddle to remodel, construct and erect in a good and workmanlike manner in accordance with plans and specifications, made a part thereof, the improvements described therein, but Clapsaddle negligently, carelessly and in disregard of the terms and conditions set forth in the agreement neglected and failed to perform such services as agreed. Such contractor caused the walls on the building to collapse, the roof was constructed so that rain water was collected thereon, causing it to leak, damaging the ceiling, floor covering and equipment within the building, the building was made to be out of line and structurally weak, the foundation not true, and Clapsaddle failed and neglected to pay for materials and labor furnished by sub-contractors and finally abandoned the job before completion thereof.

## "VIII.

"As a result of the negligent performance of the building contract, supervised from time to time by Fred Washington, agent of Armstrong, Sybrant was required to take over and complete the improvement work and, incident thereto, to pay the following expenses:

"Powers Roofing, $450.00 to repair roof;

"Fouts Plumbing, $602.00 for plumbing repairs and labor;

"F & G Sheet Metal, $500.00 for duct-work;

"The sum of $400.00 for 54 foot, 16 inch I beams;

"The sum of $200.00 for four 24 foot bar joists;

"The sum of $50.00 to repair a sign.

all of such expenditures directly resulting from the incompetent performance of said building agreement.

## "IX.

"In addition, due to the improper construction and renovation work, damages to the building amounted to the sum of $2,798.00, making total loss and damages sustained by defendants, Sybrants, in the sum of $5,000.00.

## "X.

"That Clapsaddle was not an experienced or competent building contractor for this particular type of facility and this fact was known to Armstrong and its agents prior to the commencement of said improvements. That Sybrant relied upon the representations and statements made to him by Armstrong and its agents relating to Clapsaddle and would not have entered into either the

building agreement or the lease had he been fully and correctly informed as to such matters."

We believe a fair analysis of the testimony establishes that a duty rested upon Armstrong to honestly and correctly inform Sybrant as to the experience and competence of Clapsaddle in the particular enterprise with which Sybrant was shown to be wholly unfamiliar. This duty was breached, misrepresentations were made and relied upon by Sybrants to their loss and damage.

Concerning misrepresentations by Armstrong as to Clapsaddle Sybrant testified:

"Q. All right. Now, Mr. Sybrant, did you have some conversation—I think by telephone—with Mr. Armstrong one time?

"A. Yes, at one time, Mr. Armstrong—I believed he called me, or one of his people called me, and I talked to a man who identified himself as Armstrong at Oklahoma City. I complained rather bitterly to him about the experience that we'd had with this man Clapsaddle that they and Washington had brought to me and that I was damaged severely. Mr. Armstrong at that time told me that he didn't know anything about Clapsaddle, that they hadn't had him on jobs and that Washington was no longer with him. He said something to the effect that Washington had taken advantage of his company or taken advantage of other people, and I honestly don't recall the full detail of that, but I got the impression that Armstrong—well, he told me Armstrong (sic) was no longer with the company."

The items set out in Finding No. VIII were put in evidence by the testimony of Sybrant and exhibits in connection therewith. With respect to Finding No. IX, Sybrant testified specifically as to the structural damage to the building—the roof, ceiling, walls, plumbing, etc.; what he had done by way of repairs and what would be necessary to put the building in condition it would have been in if the work had been properly done in the first place.

We believe there is ample evidence in the record to support the trial court's findings that Sybrant had no knowledge of the enterprise undertaken; that he had a right, under the circumstances shown to exist, to rely on the superior knowledge of Armstrong and its agents; and that due to the misrepresentations and negligence of Armstrong's agent Washington the damages referred to were incurred for which Armstrong is liable.

We find applicable this statement in *Reeder v. Guaranteed Foods, Inc.*, 194 Kan. 386, 399 P. 2d 822:

". . . Where one party to a contract or transaction has superior knowledge, or knowledge which is not within the fair and reasonable reach of the other party and which he could not discover by the exercise of reasonable

diligence, or means of knowledge which are not open to both parties alike, he is under a legal obligation to speak, and his silence constitutes fraud. . . ." (p. 396.)

See, also, *Jenkins v. McCormick*, 184 Kan. 842, 339 P. 2d 8; and 37 Am. Jur. 2d, Fraud and Deceit, p. 339, § 253 [Effect of exceptional circumstances—superior knowledge, standing, or experience of representor].

Appellant claims error in overruling its motion for a new trial. Its arguments on this point are largely a restatement of arguments made with respect to the trial court's refusal to grant a continuance. Appellant was unable to establish that any of the evidence proffered was newly discovered nor was any proof proffered, in the form of affidavits or otherwise, to show that counsel and witnesses were unable to be present at the trial. An affidavit of Clapsaddle was offered. It dealt mainly with the dispute between Clapsaddle and Sybrants. Clapsaddle was totally in default as a party defendant having neither answered nor appeared at any stage of the proceedings. The trial court rejected the Clapsaddle affidavit on the ground there was no showing by Armstrong that Clapsaddle would not have been produced as a witness at the trial. The record supports the ruling.

At the conclusion of the hearing on the motion for a new trial, the court ruled:

"Well, gentlemen, we have heard a lot of this, and the Court's going to take this position, gentlemen; I'm going to deny the motion for new trial I don't feel that there was any error in exclusion of evidence and that the defendants were given a fair opportunity to produce evidence. There's nothing that's been proffered to the Court that indicates any newly discovered evidence, and therefore, the Court's going to overrule the motion for a new trial."

The record supports the ruling.

We find no affirmative showing why the judgment entered in favor of Sybrants on their cross-claim against Armstrong should be disturbed.

In point five of its statement of points, Armstrong claims the trial court erred in entering judgment against it in favor of Fouts because no evidence was offered or submitted to support the judgment. While Fouts was represented by counsel, we are unable, as Armstrong says, to find any evidence offered by Fouts. It follows that Fouts's judgment in the amount of $245.00 must be set aside as to Armstrong and a new trial directed thereon.

Appellant Armstrong further points out that its cross-claim against

Sybrants was not dismissed, ruled on or disposed of in any way by the trial court. The point is well taken. Armstrong's cross-claim concerned a provision in the lease whereby Sybrants agreed to pay one-half the cost (alleged to be $788.62) of carpeting the laundry. At the trial, Sybrants' Exhibit No. 5, a memorandum signed by Fred Washington dealing with the carpeting and other matters concerning the construction contract, was offered into evidence by Sybrants. Apparently, the exhibit was offered for the purpose of showing that the construction contract was a part of the lease. We find no reference to Armstrong's cross-claim for one-half of the carpeting in any of the trial court's findings or rulings. Therefore, the matter must be remanded for determination.

The judgment entered in favor of appellees Sybrants on their cross-claim against appellant Armstrong is affirmed; the judgment of appellee Fouts is reversed as against appellant Armstrong and is remanded with directions for a new trial. The issue raised by the cross-claim of appellant Armstrong against appellees Sybrants is remanded for further proceedings.

It is so ordered.