NOT DESIGNATED FOR PUBLICATION

No. 119,119

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of D.R. and Z.R.,
Minor Children.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; DANIEL CAHILL, judge. Opinion filed November 9, 2018.
Affirmed.

*Christopher Cuevas*, of Kansas City, for appellant, natural father.

*Ashley Hutton*, assistant district attorney, and *Mark A. Dupree Sr.*, district attorney, for appellee.

Before MCANANY, P.J., PIERRON and LEBEN, JJ.

PER CURIAM:  The natural father of D.R. (born 2015) and Z.R. (born 2016) appeals
the termination of his parental rights. He argues (1) the district court violated his due
process rights by denying him the right to counsel; (2) the court abused its discretion in
declining to grant him a continuance; and (3) there was insufficient evidence to support
termination of his parental rights. We affirm.

On November 9, 2016, five-week-old Z.R. was seen at St. Luke's Hospital for
difficulty breathing. She was found to have eight rib fractures and one distal tibia fracture
of her right foot. Mother and Father said they were the only ones who cared for Z.R. The
only explanations they had for the injuries were that 18-month-old D.R. was sometimes
rough with Z.R., and Z.R. had rolled off the bed the week before. Hospital staff conveyed
that her injuries could not have been caused this way.

1

The next day, the State filed child in need of care (CINC) petitions for Z.R. and D.R. The district court placed the children in the temporary custody of the Kansas Department for Children and Families and appointed Thomas Telthorst to represent Father.

While awaiting adjudication, Father continued to have supervised visits with the children. On January 3, 2017, he visited the children at the KVC office. Jessica Dixon, Father's case manager, supervised the visit. During the visit Father took off Z.R.'s heavy onesie, and she began crying. Dixon recommended some soothing techniques to Father, but he did not use them. Instead, he became angry and began yelling and cussing. He said that something was wrong with Z.R.'s leg. Father also grabbed D.R.'s arm, tossed her onto the visiting room couch, and told her, "Sit the fuck down! Do you need a whupping?"

Dixon was eventually able to remove the children from the room safely. In trying to figure out what Father was so upset about, Dixon noticed minimal swelling of Z.R.'s right ankle. Z.R.'s foster family took her to Shawnee Mission Medical Center to have her ankle checked.

After the foster family left, the police arrived at the KVC office. Father had reported that someone had broken Z.R.'s leg, and they were following up on the report. KVC staff later spoke with Z.R.'s foster family and a social worker at the medical center. Both reported that other than her healing fractures, Z.R. was fine.

A little over a week later, the children had a supervised visit with both Father and Mother. Z.R. began crying when she got into the visiting room. Father asked Dixon to call Z.R.'s foster family and ask if Z.R. cried at home. Dixon said she had spoken with Z.R.'s foster family, and they said she cried like a normal infant. Father made a comment under his breath that "you guys" were in denial that something was wrong with Z.R.

2

A few minutes later, Father borrowed Mother's cell phone. He called 911 and told them they needed to come to KVC because something was wrong with his baby. Ten minutes later, the fire department and paramedics arrived at the KVC offices. Dixon explained the situation, and the paramedics said they could not help unless Z.R.'s legal guardian felt there was an emergency.

In January 2017, the district court adjudicated the children as CINCs. The court entered interim orders, including that Father should (1) continue to have supervised visits with the children; (2) participate in a domestic violence assessment and follow the recommendations; (3) participate in a mental health assessment and follow the recommendations; and (4) obtain and maintain stable housing and employment.

At a disposition hearing in February 2017, both Father and Telthorst were present. The court found reintegration was still viable.

In May 2017, police were dispatched to Father and Mother's apartment. According to the police affidavit, Mother had called the police, saying Father had hit her. When they arrived, Mother's whole face was swollen and covered in bruises. She was later found to have two orbital bone fractures as well as bruises on her face, back, and arms.

Mother told police that Father had punched her in the face several times, bit her nose, and repeatedly squeezed his thumbs against her throat, preventing her from breathing. Mother tried to call 911, but Father took her phone. Father would not let Mother leave their apartment. He forced her to quit her job so no one would see the bruises on her face. Father also quit his job so he could prevent Mother from leaving the apartment. After three days, Father gave Mother her phone back. When he left to get food, Mother called the police.

In a phone call, Father told police that Mother had "blacked out" and started hitting him. He said the only way to stop her was to "whoop her" or "beat her up." He admitted that Mother had two black eyes after the incident.

The State charged Father with kidnapping, aggravated battery, and unlawful acts concerning computers arising out of the May 2017 incident. Father later testified that he was not immediately arrested on these charges because he went to California without telling anyone. He was arrested in California and extradited to Kansas in June 2017. He was then incarcerated for seven to eight months.

In June 2017, the district court held a review hearing. Father did not appear, but Telthorst did. The court ordered that Father not have any contact with Mother or the children without further court orders.

Father eventually pleaded guilty to attempted kidnapping and aggravated battery. In December 2017, he was sentenced to three months in a residential center and three years of probation. Shortly before his sentencing, he sent a 16-page letter to the district court, Telthorst, and his court services officer. In the letter, Father denied responsibility for the May 2017 incident involving Mother and claimed he had only been acting in self-defense. He blamed Mother for their relationship problems. He also alleged that Mother had ties to the Mafia and was trying to have him killed. He reiterated that he loved his children and wanted a chance to take care of them properly.

The State eventually moved to terminate Father's parental rights. The State did not move to terminate Mother's parental rights, and the record suggests the children have been placed with her in Nevada. The district court held a termination hearing at the end of January 2018.

4

At the beginning of the hearing, Father told the district court that he wanted a new attorney. When the court asked why, Father said, "Because he's not defending me, trying to get custody of . . . my children." The court responded, "I do believe that he's representing you." The court added that Father's motion was untimely. Telthorst had been Father's attorney throughout the case, but he had raised no concerns before the termination hearing. Father had written a long letter to the court but had not mentioned that he was dissatisfied with Telthorst's representation. The court added that the case needed to be heard, and it was not going to grant a continuance to replace Telthorst.

Father responded that he had not previously raised his concerns because he had been in jail. He added that at a previous hearing, Telthorst had not appeared. The court acknowledged that another attorney had appeared in Telthorst's place at a review hearing. But the court added that Telthorst often appeared in that court and did an exemplary job representing parents. The court told Father, "I have not heard, nor do I have any reason to believe, that Mr. Telthorst has been derelict in any manner in his representation of you."

The district court gave Father the option of continuing to allow Telthorst to represent him or to proceed pro se. Father responded that he wanted a different attorney. The court reiterated that it would not continue the case, and Father could choose between continuing with Telthorst's representation or continuing pro se. Father decided to proceed pro se, and the court excused Telthorst.

Father was the first witness to take the stand at the hearing. After Father was sworn in, the guardian ad litem asked the district court to get a knowing and voluntary waiver of counsel from Father. The court noted that this was a civil case, not a criminal case. The court then read K.S.A. 2017 Supp. 38-2205 governing a parent's right to counsel in termination proceedings. The court determined that the statute had been followed because it had appointed an attorney for Father. Father had declined that attorney's services and chosen to proceed pro se.

5

Father testified he was currently at a residential center for a work release program. He was set to get out of the residential center in March 2018, and he planned to move to a new place. He said he was currently working at Pizza Hut.

Father told the court he had not been with Z.R. when she was injured. He believed her fractures happened because Mother had fallen asleep on her. He said he had told several people that was how she was injured.

Father identified the affidavit about the May 2017 incident but claimed "they made most of it up." He said he and Mother were fighting, but they stopped when they got tired. They both decided not to call the police. But three days later, Father left to get some food and when he got back, Mother was gone.

Father explained he went to California after the incident to sell his car to get enough money to pay for bond and a lawyer. He also wanted to move there eventually with his children. While he was in California, he applied for jobs. He planned to come back to Kansas to get his kids and do everything he needed to do for his criminal case.

Father admitted he had also gotten into a fight with Mother in 2014. According to Father, she wanted him to do something and started hitting him. He hit her back. She later called the police, and they arrested him. He eventually pleaded guilty to assault and served two years on probation.

Father testified he had taken a mental health assessment, but he had made no progress on the recommendations. He stated he had never been diagnosed with a mental illness. He had almost finished his parenting classes before he went to jail. He had not seen his children since May 2017.

6

Father admitted it was not good for the children to see their parents fighting. He stated he and Mother had relationship issues to work on. He also said that domestic violence treatment could be valuable to him. But, he added that Mother needed mental health treatment. He did not think he needed any mental health treatment because he believed his mental health was fine.

Cynthia Moses, the clinical director at Transitions Counseling Services and a social work clinician, also testified. She had four sessions with Father in February 2017, and did a Safe Kids assessment with him. As part of the Safe Kids assessment, Moses did a domestic violence assessment. During the assessment, Father denied that domestic violence was an issue in his relationship with Mother. He also denied any responsibility for Z.R.'s injuries. He provided several innocent explanations for her injuries, including that Mother had fallen asleep on her. Moses said that Z.R.'s injuries were not consistent with any of his explanations, but they were consistent with physical abuse.

Moses diagnosed Father with post-traumatic stress disorder (PTSD) because of childhood trauma. She had recommended that Father (1) get a mental health medication evaluation; (2) participate in mental health counseling; (3) resolve all legal matters; and (4) obtain and maintain stable housing and income. She had also recommended that Father participate in the Safe Kids group.

Moses testified that Father had attended six Safe Kids classes before the May 2017 incident. Based on what she learned from the facilitator of his Safe Kids group, Father understood the information but had made no changes. Since the May 2017 incident, she had no contact with Father other than a voice message he left asking how to "get his group started."

Moses testified she had domestic violence concerns about Father and Mother's relationship. She said that when one partner was trying to control the other partner, he or

she is usually controlling over the children, too. That partner might also use the children to control the other partner. She stated she had these concerns about Father.

Moses recommended the termination of Father's parental rights. She testified Father had shown no accountability up to that point, and he had made no changes to his aggressive behaviors. She also recommended termination based on the length of the case.

Dixon testified that as far as she knew, Father had no income at the time of the hearing. She also stated she had several personal experiences that made her question Father's ability to parent. She recalled the two visits in January 2017 that she supervised.

Dixon had seen Mother after the May 2017 incident. Mother's face was so swollen Dixon did not immediately recognize her. Both sides of Mother's face were black, blue, and yellow. She had bruising on her arms. Dixon stated Mother had shown up for a visit in April 2017 with bruising around her neck and arms.

After the May 2017 incident, Dixon called Father on Mother's behalf. Mother did not have any of her belongings, and Father had kept both keys to the apartment, even though both their names were on the lease. During that call, Father admitted they had gotten into a fight but claimed Mother had started it. He said Mother tried to grab his genitals, and he was defending himself. After that call, Dixon had little contact with him because he would not answer his phone or respond to text messages. He also had no contact with the children after that.

Dixon testified she had verification that Father had completed a Safe Kids assessment and attended several classes. She had no verification that he had completed any other court order. She had also not seen any improvement in Father's parenting or his aggressive tendencies. She recommended termination of his rights to protect the safety of the children.

The district court terminated Father's parental rights. The court found Father was unfit by reason of conduct or condition which rendered him unable to properly care for a child, the conduct or condition was unlikely to change in the foreseeable future, and it was in the best interests of the children to terminate his parental rights. Father appeals.

*Due Process*

Father argues his due process rights were violated because he was denied the right to counsel. He explains his statutory right to counsel under K.S.A. 2017 Supp. 38-2205(b)(1) was a procedural protection to which he was entitled. He asserts he was denied this procedural protection when the district court failed to inquire into his conflict with Telthorst. He was also denied this protection when the court failed to inform him of the disadvantages of proceeding pro se.

Father acknowledges he did not raise this issue before the district court. Generally, issues not raised before the district court cannot be raised on appeal. See *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). There are several exceptions to this general rule, including: (1) the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent the denial of fundamental rights; and (3) the judgment of the trial court may be upheld on appeal despite its reliance on the wrong ground or having assigned a wrong reason for its decision. *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014).

Father argues that we must consider his argument to serve the ends of justice and prevent the denial of fundamental rights. The Court of Appeals has considered a similar argument under the same exception. See *In re W.H.*, No. 112,909, 2015 WL 4716335, at *4-5 (Kan. App. 2015) (unpublished opinion) (addressing the father's argument that his

due process rights were violated because he was denied his statutory right to counsel for the first time on appeal). We may thus address this issue for the first time on appeal.

Due process fundamentally requires the opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976); *Winston v. Kansas Dept. of SRS*, 274 Kan. 396, 409, 49 P.3d 1274 (2002). Due process is flexible and requires only such procedural protections as the particular situation demands. *In re Adoption of B.J.M.*, 42 Kan. App. 2d 77, 82, 209 P.3d 200 (2009). And a due process violation exists only when a claimant can establish that he or she was denied a specific procedural protection to which he or she was entitled. *Winston*, 274 Kan. at 409. Whether Father's due process rights were violated is a question of law subject to de novo review. *In re Adoption of B.J.M.*, 42 Kan. App. 2d at 81.

Father points to his statutory right to counsel as the procedural safeguard of which he was denied. Under K.S.A. 2017 Supp. 38-2205(b)(1),

> "If at any stage of the proceedings a parent desires but is financially unable to employ an attorney, the court shall appoint an attorney for the parent. It shall not be necessary to appoint an attorney to represent a parent who fails or refuses to attend the hearing after having been properly served with process in accordance with K.S.A. 38-2237, and amendments thereto. A parent or custodian who is not a minor, a mentally ill person or a disabled person may waive counsel either in writing or on the record."

Father alleges the district court committed two errors which denied him this right. First, he claims the court should have inquired more into his concerns with Telthorst. Second, he contends the court should have advised him of the disadvantages of proceeding pro se before allowing him to waive it.

To determine whether due process required the district court to inquire more into Father's concerns with Telthorst or advise Father of the disadvantages of proceeding pro

10

se, we apply the balancing test set out in *Mathews*. That test requires us to weigh these factors: (1) the individual interest at stake; (2) the risk of erroneous deprivation of the interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (3) the State's interest in the procedures used, including the fiscal and administrative burdens that any additional or substitute procedures would entail. 424 U.S. at 335; *Winston*, 274 Kan. at 409-10.

As to the first *Mathews* factor, the individual interest at stake is Father's fundamental right to custody and control of his children. In this context, "the private rights affected by governmental action are very significant and are entitled to the highest protection from unwarranted governmental action." *In re J.L.*, 20 Kan. App. 2d 665, 671, 891 P.2d 1125 (1995).

As for the second *Mathews* factor, Father alleges two errors the district court made. First, he argues the district court had a duty to inquire more fully into his concerns about Telthorst. He notes that in criminal cases, the court has a duty to inquire more after learning of a possible conflict between an attorney and a client. He acknowledges that CINC proceedings are civil and not criminal, but he argues the same duty should apply to provide parents with maximum protection of their rights.

Assuming, without deciding, that this same duty to inquire applies in CINC proceedings, the district court did not err. To trigger the district court's duty to inquire in a criminal case, a defendant must show justifiable dissatisfaction with counsel. See *State v. Wells*, 297 Kan. 741, 754, 305 P.3d 568 (2013). This may include a conflict of interest, an irreconcilable disagreement, or a complete breakdown in communication between counsel and the defendant. 741 Kan. at 754. But "lackluster advocacy does not equate to an obvious conflict that must receive immediate, on-the-record attention from the district court." *State v. Hulett*, 293 Kan. 312, 323, 263 P.3d 153 (2011). Here, the court asked Father why he was unsatisfied with Telthorst. Father responded that Telthorst was not

11

defending him. At most, this is lackluster advocacy and thus did not trigger the court's duty to inquire more. See *Wells*, 297 Kan. at 755-56 (finding one open-ended question into defendant's concerns about attorney sufficient because it gave defendant an opportunity to suggest justifiable dissatisfaction and defendant failed to articulate anything that warranted follow up). Father's argument on this point fails.

Father also argues he did not knowingly waive his right to counsel. Again, Father relies on criminal procedure to support his argument. He points to the rule that district courts must inform the defendant of the dangers and disadvantages of self-representation before the defendant can waive the right to counsel.

Under the Sixth Amendment to the United States Constitution, a criminal defendant has both the right to counsel and the right to self-representation. As to a defendant's waiving the right to counsel and proceeding pro se, the Kansas Supreme Court has held that:

> "'A criminal defendant who before trial clearly and unequivocally expresses a wish to proceed pro se has the right to self-representation after a knowing and intelligent waiver of the right to counsel. A knowing and intelligent waiver requires that the defendant be informed on the record of the dangers and disadvantages of self-representation. The choice is to be made "with eyes open." [Citation omitted.]'" *State v. Graham*, 307 Kan. 463, 470, 410 P.3d 902 (2018).

These requirements aim to protect a criminal defendant's constitutional right to counsel. But it does not necessarily follow that the same standards apply to the waiver of the statutory right to counsel in CINC proceedings. The Sixth Amendment does not apply to CINC proceedings. And indigent parents have no absolute right to appointed counsel under the Due Process Clause of the United States Constitution. *Lassiter v. Department of Social Services*, 452 U.S. 18, 31-32, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981) (finding constitutional right to counsel for indigent parents in termination proceedings must be

12

decided case by case). Father has provided no support for his argument that the standards for the waiver of a statutory right to counsel in civil proceedings should be the same as the waiver of a constitutional right to counsel in criminal proceedings. See *State ex rel. A.E.*, 29 P.3d 31, 34 (Utah App. 2001) (declining to apply the same standards for waiving constitutional right to counsel in the criminal context to waiver of the statutory right to counsel in termination proceedings). Contra *Tammy M. v. Dept. of Child Safety*, 242 Ariz. 457, 461-62, 397 P.3d 1057 (2017) (holding indigent parent in termination proceedings has a right to appointed counsel by statute and as a matter of due process, so court must advise of dangers of self-representation before valid waiver).

Some Kansas cases have found there is a constitutional dimension to the statutory right to counsel in CINC proceedings. See, e.g., *In re T.M.C.*, 26 Kan. App. 2d 297, 299, 988 P.2d 241 (1999). But other cases have distinguished between the constitutional rights of parents in CINC proceedings and rights of a defendant in a criminal case. See *In re J.D.C.*, 284 Kan. 155, 165-66, 159 P.3d 974 (2007) (explaining parent's right to confrontation in CINC proceedings is grounded in Due Process Clause and subject to *Mathews* balancing test); *In re L.B.*, 42 Kan. App. 2d 837, 840-42, 217 P.3d 1004 (2009) (declining to hear parent's untimely appeal under fundamental fairness exception from *Ortiz*). Other cases have implied that the standards for waiving a statutory right to counsel are not as high as the standards for waiving a constitutional right to counsel. See *State v. Tims*, 302 Kan. 536, 545, 355 P.3d 660 (2015) (declining to apply certification and procedural standards to ensure district court has properly advised defendant of constitutional right to counsel to waiver of statutory right to counsel); *State v. McCormick*, No. 107,310, 2012 WL 5519209, at *3 (Kan. App. 2012) (unpublished opinion) (finding Sixth Amendment does not apply to appeals and waiver of right to counsel at district court level sufficient to waive statutory right to appellate counsel).

Additionally, based on the facts here, it is not clear the risk of erroneous deprivation would have been significantly reduced by the district court advising Father of

the dangers and disadvantages of self-representation. The district court had already appointed counsel for Father. The record shows that Father understood he was choosing to proceed without the representation of that counsel. The proceedings were not particularly complex, and no expert witnesses testified. See *Lassiter*, 452 U.S. at 32 (noting that indigent parent was not entitled to appointed counsel in termination hearing as a matter of due process in part because "no expert witnesses testified and the case presented no specially troublesome points of law"). As Father argues, Moses' testimony that a Safe Kids group facilitator had told her that Father had made no changes may have been hearsay. But this error likely made little difference to the outcome, because the evidence in support of termination was overwhelming. See *Lassiter*, 452 U.S. at 32-33 (noting that, even though hearsay was admitted, the weight of the evidence supporting termination of parental rights "was sufficiently great that the presence of counsel . . . could not have made a determinative difference").

The third *Mathews* factor requires us to consider the government's interest in the procedures used as well as the burdens of any additional procedures. Father acknowledges the State has a significant interest in protecting children. "[T]he government's parens patriae interest in protecting minor children is substantial and of great importance." *In re J.L.*, 20 Kan. App. 2d 665, 675, 891 P.2d 1125 (1995). The Kansas Code for Care of Children (Code) should be construed to "'best serve the child's welfare.'" *In re J.A.H.*, 285 Kan. 375, 386, 172 P.3d 1 (2007); see 2017 Supp. 38-2201(b)(1). Courts must also dispose of proceedings without unnecessary delay, and consider a child's sense of time in reaching a resolution. *In re J.A.H.*, 285 Kan. at 386; see also K.S.A. 2017 Supp. 38-2201(b)(4).

Admittedly, advising parents of the disadvantages of proceeding pro se alone would not create a heavy burden on the State. But as discussed in the next issue, the district court did not abuse its discretion in declining to grant a continuance. So even if

14

the court had given Father's proposed advisement, he would have still been left with the choice to proceed that day pro se or with counsel he was not satisfied with.

Weighing the *Mathews* factors, Father's due process rights were not violated. Father was appointed counsel who represented him up until the termination hearing. At that hearing, Father made clear to the district court that he no longer wished to proceed with that counsel's representation. The proceedings here were not particularly complex, so Father did not face the same disadvantages he may have faced in other proceedings. And Father testified as well as cross-examined the other two witnesses in the case.

Even if the district court should have advised Father of the dangers of continuing pro se, we must still determine the appropriate remedy for this due process violation. Father makes no argument on this point. He has not claimed that the district court's error was reversible. Nor does he request a specific remedy. The State argues that Father needed to show prejudice, and he cannot do so because the evidence in favor of termination was overwhelming.

When an error infringes on a party's federal constitutional right, a court will declare a constitutional error harmless only when the party benefiting from the error persuades the court "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, proves there is no reasonable possibility that the error affected the verdict." *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 [1967]). As the State argues, the evidence in favor of termination was overwhelming. This CINC case started because Z.R. had injuries consistent with physical abuse. During supervised visits with the children, Father displayed erratic and aggressive behavior. He had three convictions for violent crimes against Mother. By the time of the termination hearing, he had made little progress on his case plan tasks. And at the hearing, he refused to accept responsibility for his actions.

15

Father does not point to any line of questioning or argument an attorney could have presented that would have prevented the termination of his parental rights. Thus, any error was harmless.

*Abuse of Discretion*

Father argues the district court abused its discretion when it did not grant a continuance to appoint new counsel. Father acknowledges he requested no continuance. But he argues his request for a new attorney inherently involved a request for a continuance.

We review a district court's refusal to grant a continuance for an abuse of discretion. *In re J.A.H.*, 285 Kan. at 384. A judicial action constitutes an abuse of discretion if no reasonable person would take the view adopted by the district court. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015); *In re J.A.H.*, 285 Kan. at 385.

In *Fouts v. Armstrong Commercial Distributing Co.*, 209 Kan. 59, 65, 495 P.2d 1390 (1972), the Kansas Supreme Court held, "In ruling on a motion for continuance . . . a court must consider all circumstances, particularly such matters as the applicant's good faith, his showing of diligence, and the timetable of the lawsuit." The Kansas Supreme Court later applied these factors in the context of a CINC proceeding. *In re J.A.H.*, 285 Kan. at 385. Under the *Fouts* factors, the district court did not abuse its discretion by refusing to grant a continuance on the morning of the termination hearing to appoint new counsel for Father.

Father's request for new counsel the morning of the hearing suggests a lack of good faith and diligence. Telthorst had been representing Father for months, but Father brought no complaints to the district court's attention before the morning of the hearing.

16

And while Father claimed he could not do so because he was in jail, he had sent the court a 16-page letter two months earlier in which he mentioned no problems with Telthorst.

Father's request the morning of the hearing was also inconsistent with the timetable of CINC proceedings. See *In re J.A.H.*, 285 Kan. at 386. As discussed in the previous issue, the Code requires that all proceedings be disposed of without unnecessary delay and that its provisions be "liberally construed" to "best serve the child's welfare." K.S.A. 2017 Supp. 38-2201(b)(2) and (b)(4); *In re J.A.H.*, 285 Kan. at 386. Courts must also resolve these cases in "child time" rather than "adult time." *In re D.T.*, 30 Kan. App. 2d 1172, 1175, 56 P.3d 840 (2002). Here, the district court found that the case needed to be heard and Father's request was untimely.

The *In re J.A.H.* court recognized that "denying a request for continuance—which can affect a statutory right to counsel that is designed to safeguard parental rights—may not necessarily be judged on the typical 'abuse of discretion' basis." 285 Kan. at 386. The court then cited *Saucedo v. Winger*, 252 Kan. 718, 731-32, 850 P.2d 908 (1993), noting,

> "The amount and degree of judicial discretion will vary depending on the character of the question presented for determination. If a statutory right has been violated, the trial court's use of discretion is limited. Under these circumstances there is a greater need for articulation by the trial judge of the reasons for his or her 'discretionary' decision." *In re J.A.H.*, 285 Kan. at 386.

Father argues the district court did not meet this greater need for articulation because the court did not inquire more into his concerns about Telthorst. But as already discussed, the court had no duty to inquire more into Father's concerns. The court found there was no reason to believe Telthorst had been doing a poor job in representing Father. The court did not abuse its discretion in declining to grant a continuance.

17

*Sufficiency of the Evidence*

Finally, Father argues there was insufficient evidence to find he was unfit, and the district court abused its discretion in finding it was in the best interests of D.R. and Z.R. to terminate his parental rights. The Kansas Legislature has specified that the State must prove "by clear and convincing evidence that the child is a child in need of care." K.S.A. 2017 Supp. 38-2250. In addition to CINC adjudications, the clear and convincing evidence standard of proof applies to all termination of parental rights cases. K.S.A. 2017 Supp. 38-2269(a)

"When this court reviews a district court's termination of parental rights, we consider whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the parent's rights should be terminated. [Citation omitted.]" *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011). In making this determination, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

The Code provides that the court may terminate parental rights when a child has been adjudicated a CINC. K.S.A. 2017 Supp. 38-2269(a). The statute lists nonexclusive factors the court shall consider in determining unfitness. K.S.A. 2017 Supp. 38-2269(b). The court must also consider a separate list of nonexclusive factors when a child is not in the parent's physical custody. K.S.A. 2017 Supp. 38-2269(c). Any one of the factors in K.S.A. 2017 Supp. 38-2269(b) or (c) may, but does not necessarily, establish grounds for termination of parental rights. K.S.A. 2017 Supp. 38-2269(f).

Upon making a finding of unfitness of the parent, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best

18

interests of the child." K.S.A. 2017 Supp. 38-2269(g)(1). In making such a decision, the court shall primarily consider the physical, mental, and emotional needs of the child. K.S.A. 2017 Supp. 38-2269(g)(1).

*Finding of Unfitness*

A review of the record, in the light most favorable to the State, shows there was clear and convincing evidence supporting the district court's finding that Father was unfit under these factors: (1) K.S.A. 2017 Supp. 38-2269(b)(1), "Emotional illness, mental illness, mental deficiency or physical disability of the parent, of such duration or nature as to render the parent unable to care for the ongoing physical, mental and emotional needs of the child"; (2) K.S.A. 2017 Supp. 38-2269(b)(2), "conduct toward a child of a physically, emotionally or sexually cruel or abusive nature"; (3) K.S.A. 2017 Supp. 38-2269(b)(7), "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family"; (4) K.S.A. 2017 Supp. 38-2269(b)(8), "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child"; and (5) K.S.A. 2017 Supp. 38-2269(c)(3), "failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home."

As for K.S.A. 2017 Supp. 38-2269(b)(1), Moses had diagnosed Father with PTSD. She testified that Father could be erratic and angry. Father denied he had any metal health problems and did not follow through on any mental health recommendations.

As for K.S.A. 2017 Supp. 38-2269(b)(2), the current case began when five-week-old Z.R. was found to have eight rib fractures and a broken distal tibia. Medical staff reported that Z.R.'s injuries could not have been caused by roughhousing or rolling off a bed. Moses testified the injuries were consistent with physical abuse. Mother and Father both stated that they were the only ones who cared for Z.R., which limited the possible

19

abusers to one or both of the parents. But other evidence lead the district court to conclude Father was the abuser. Father had several convictions for violent offenses against Mother. In his supervised visits, Father was irrational and angered easily. He had also cussed at D.R. and had thrown her on the couch.

As for the final three factors, Father had completed a couple assessments, attended several sessions with Moses, and attended several sessions of a Safe Kids group in the 14 months this case was pending. He had completed no other court orders. During this case, Father committed and was convicted of violent crimes against Mother. Father had little contact with Moses or Dixon since that incident. He had no contact at all with the children. At the hearing, Father continued to deny his responsibility for the violence in his relationship with Mother. He also denied he had any mental health issues that needed treatment.

Father argues the evidence does not show he lacked accountability, noting he testified he did find himself accountable. Granted, when the guardian ad litem asked Father, "Did you ever take any accountability for any of the physical violence between you and the mom?" he answered, "Yeah." But he also testified that the information in the police affidavit was "made up." He read parts of his 16-page letter, stating that Mother was hurting him and trying to have him killed. He told the district court that "the only mistake I made in my life is . . . fighting back and fighting for my life."

Clear and convincing evidence must also support the district court's finding that the conduct or condition rendering Father unfit is unlikely to change in the foreseeable future. K.S.A. 2017 Supp. 38-2269(a). This court examines the term "foreseeable future" from the perspective of a child. *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014). Children and adults have different perceptions of time, and a child has the right to permanency within a time frame that is reasonable to them. 50 Kan. App. 2d at 1170. And a district court may look to a parent's past conduct as an indicator of future behavior.

20

See *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982); *In re M.T.S.*, No. 112,776, 2015 WL 2343435, at *8 (Kan. App. 2015) (unpublished opinion) ("Parental unfitness can be judicially predicted from a parent's past history.").

Father points out that he anticipated being released from the residential center in about six weeks. He had also attended all the required Safe Kids classes before the May 2017 incident. And at trial, he made clear that he wanted to fight for his children, and at one point said, "I'll do whatever it take[s]."

But this does not show that Father was likely to become fit in the foreseeable future. We have acknowledged that a parent who loves his or her child and wants to "do the right thing" may still be found unfit because courts must judge parents by actions and not intentions. *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008). Father said he would do what he had to do to get his children back. But his actions belie this claim. As the record shows, Father had made no progress in changing his aggressive and violent behavior by the time of the termination hearing. He continued to assert that nothing was wrong with him, and he had only been defending himself.

*Best Interests Determination*

Father also challenges the district court's determination that termination of his parental rights was in the best interests of D.R. and Z.R. Because the district court hears the evidence directly, it is in the best position to determine the best interests of the child. *In re K.P.*, 44 Kan. App. 2d 316, 318, 235 P.3d 1255 (2010). We will not overturn that determination absent an abuse of discretion. 44 Kan. App. 2d at 318. A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) the action is based on an error of law; or (3) the action is based on an error of fact. *Wiles*, 302 Kan. at 74.

21

The district court determined that termination of Father's parental rights was in the best interests of the children. The court acknowledged that Father loved the children and wanted to provide for them, but it also found he was a danger, and did not "have the capacity to address [his] issues and to recognize [his] own faults to the point where those can be worked on." The court added, "I dread what could happen to the mother and to the children were you allowed some sort of contact with them, ability to know what their circumstances are and all of those things. I do believe you present a clear and present danger to the health and welfare of the mother and the children."

Father argues he fought for his children and showed a desire to continue caring for them. The district court acknowledged this. But the court also found he lacked the capacity to address his issues, and he presented a danger to his children. Because a reasonable person could agree with this finding, the court did not abuse its discretion.

Affirmed.