IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 118,235

STATE OF KANSAS,
*Appellee*,

v.

ANTHONY RAYMOND BECKER,
*Appellant*.

SYLLABUS BY THE COURT

1.

In determining whether a particular statement falls outside of the wide latitude given to prosecutors, the court considers the context in which the statement was made, rather than analyzing the statement in isolation.

2.

Even if a requested lesser included offense instruction would have been both factually and legally appropriate, a district court's failure to give such instruction may still be harmless if the court is convinced there was no reasonable probability that the failure affected the verdict.

3.

Under the facts of the case, a district court's failure to give a requested lesser included offense instruction of second-degree homicide was harmless when no evidence was presented to enable the jury to conclude that the homicide was anything other than premeditated.

1

4.

In a noncapital case, a district court's failure to instruct on a lesser included offense does not impair a defendant's constitutional right to a trial by jury or right to due process.

5.

Evidence of consumption of an intoxicant near the time of the commission of a crime does not automatically warrant the giving of a voluntary intoxication instruction.

6.

When no direct evidence of a defendant's impairment was presented to the jury in a premeditated first-degree homicide trial, a district court does not necessarily err in failing to give a voluntary intoxication instruction even when evidence of consumption of an intoxicant is presented.

7.

Relief under the cumulative error doctrine cannot be predicated upon a single error.

8.

A sentencing court has no authority to order a term of postrelease supervision in conjunction with an off-grid, indeterminate life sentence.

Appeal from Ford District Court; SIDNEY R. THOMAS, judge. Opinion filed February 28, 2020. Judgment of the district court is affirmed in part and vacated in part.

*Patrick H. Dunn,* of Kansas Appellate Defender Office, argued the cause, and *Peter Maharry*, of the same office, was on the briefs for appellant.

*Natalie A. Chalmers*, assistant solicitor general, argued the cause, and *Derek Schmidt*, attorney general, was with her on the brief for the appellee.

The opinion of the court was delivered by

MCANANY, J.: A jury found Anthony Raymond Becker guilty of first-degree premeditated murder. On direct appeal, Becker asserts a claim of prosecutorial error, three claimed errors related to jury instructions, and an illegal sentence of lifetime postrelease supervision.

Upon review, we conclude that (1) the prosecutor did not err in his comments in closing argument; (2) the district court did not commit reversible error in failing to instruct on lesser included crimes and on voluntary intoxication; (3) Becker's newly raised constitutional claims are without merit; and (4) there are not cumulative errors that require reversal; but (5) the district court erred in ordering lifetime postrelease supervision following Becker's indeterminate life sentence.

Accordingly, we affirm Becker's conviction of first-degree murder, but vacate the portion of his sentence ordering lifetime postrelease supervision.

FACTUAL AND PROCEDURAL BACKGROUND

Anthony Becker, Chelsea Sosa, and Chris Boyd spent an afternoon in April 2015 smoking methamphetamine and driving around Dodge City. When they had consumed most of their meth they discussed ways of getting more. Boyd and Sosa were dating at the time. Boyd suggested that Sosa could engage in prostitution as a means of obtaining money to buy more methamphetamine. Sosa was hurt and angered by the idea.

Becker was Sosa's ex-boyfriend, having dated her before Boyd did. Becker knew of the proposal that Sosa engage in prostitution, and he viewed Boyd as having a corrupting influence over Sosa. As a result, Becker planned to do away with Boyd. In order to set up the crime, Becker told Boyd they could find money in his parents' shed, but he would need Boyd's help moving something in order to get to the money. Once they arrived at Becker's parents' house in rural Ford County in the predawn hours of the following morning, Becker and Boyd headed for the shed, with Boyd in the lead. As Becker left the house behind Boyd, he grabbed a loaded pistol from a buffet in the house. When they got to the back of the shed, Becker fired 10 shots at Boyd, striking him 6 times. After Boyd fell to the ground, Becker stomped on Boyd's head to make sure he was dead. Becker walked back to the house, where he told Sosa that he had just killed Boyd. James Schmidt later helped Becker dispose of Boyd's body.

Police found Boyd's body under the Bucklin Bridge in Ford County and later arrested Becker, Sosa, and Schmidt. Becker was interviewed by police officers and he confessed to shooting Boyd. Becker was charged with first-degree premeditated murder and conspiracy to commit first-degree murder. Sosa and Schmidt entered into plea agreements with the State and received probation.

Before trial Becker unsuccessfully challenged the voluntariness of his confession. He does not now challenge that adverse ruling on appeal.

The video recording of Becker's confession was played for the jury during trial and again during deliberations, at the jury's request. In the video Becker recounted the events leading up to Boyd's death and stated: "I shot him." He said he told Boyd there was money hidden in the shed, a lie calculated to lure Boyd to his death. Becker explained he was motivated by the corrupting influence Boyd had over Sosa. Becker said

4

that Schmidt helped him dispose of Boyd's body. The police provided Becker with pen and paper and suggested that he write an apology letter to Boyd's family. Becker did so. He wrote:

> "I am undiscribibly [*sic*] sorry for what I did to Chris, but I did It to save Chelsea's life. Chelsea means everything to me and what Chris was doing was destroying her. I wish there could have been another way but I did what I needed to do to protect the woman that is my world. There is nothing that can be done to fix It and apology doesn't even come close. But I am sorry."

At the close of all the evidence Becker requested jury instructions on the lesser included crimes of second-degree murder and voluntary manslaughter. Becker also requested an instruction on voluntary intoxication. The court declined to give any of these requested instructions. The court's jury instructions included the directive: "In your fact-finding, you should consider and weigh everything admitted into evidence."

In Becker's closing argument, his counsel attacked Sosa's credibility. He conceded the accuracy of some of her testimony, namely that Boyd wanted Sosa to prostitute herself in order to get money with which they could buy more drugs. But Becker's counsel argued from this that Sosa—rather than Becker—had a motive to kill Boyd.

> "We have [Sosa] testifying that she was mad at Boyd because he wanted to pimp her out for methamphetamine. That gives her a motive, ladies and gentlemen. In fact, it was the night that happened where he suggested: Let's sell you for sex so I can have drugs. Shortly thereafter Boyd ended up dead."

Counsel also argued that Sosa had written a letter of apology to Boyd's family, further evidencing her guilt as the one who pulled the trigger. Sosa's letter had been admitted into evidence. She wrote:

5

"I am sorry truely [*sic*] sorry I lied to you and didn't call the cops after this happened. I didn't know what to do or say[.] I've never gone through anything in my life like this[.] I hope you can understand I feared the whole situation. I really did care about Chris and I[']m sorry and completely understand if you despise and hate me."

Moreover, Becker's counsel argued: "Sosa took the stand yesterday in front of you, said, yep, I was charged with first degree murder as well. I made a plea deal for probation."

In the State's rebuttal argument, the prosecutor made reference to the plea agreements the State entered into with Sosa and Schmidt.

"[Becker] told you that James Schmidt was only there to help dispose of the body. And, he also told you that James Schmidt was not there at the time of the murder. He didn't say that specifically in that language, but based on what he told you, Schmidt showed up to help move the body later. Nobody has put James Schmidt at Becker's house when this shooting occurred.

"Now, let's talk about Chelsea Sosa for a minute, and James Schmidt. Both of them were convicted for what they actually did in this case. Both of them got convicted of obstructing apprehension or prosecution. You heard a little bit about what they did to qualify for that.

"Also, James Schmidt was convicted of conspiracy to commit aggravated battery. He said he wanted to severely beat Chris up. But, he didn't do it. That was never done. He did have a stick, but he never completed the aggravated battery. Also, this did not even involve a gun.

"You can think back on the evidence and see if you think there was any evidence to support that [Sosa] or [Schmidt] had any part in murdering Chris.

"And, even if you don't believe Chelsea Sosa, you have the Defendant's statement that contains all the evidence you need to convict him of murder in the first degree.

6

"This case really boils down to a number of things. Defendant said he shot and killed Chris Boyd. How much or how little meth [Chelsea] Sosa used, doesn't matter. Anything Chris Boyd wanted Chelsea Sosa to do doesn't matter. It does not matter what happened to James Schmidt or Chelsea Sosa as far as their charges in this case.

"During *voir dire*, do you remember I asked you if you'd be able to consider this case without considering what happened or what was going to happen to Sosa and Schmidt? Now you need to remember that.

"What happened to them, what they pled to or didn't plead to, that is not part of this case.

"It doesn't matter how many people Sosa was having sex with. That's not here. That's not a matter.

"Also, the Defendant wrote an apology letter. Do you apologize if you didn't do something?

"It also doesn't matter if Sosa had positive U.A.'s for meth in the last few days.

"The bottom line in this case is that the Defendant, in his recorded interview, told you how he intentionally killed Chris Boyd. He told you how he did it with meditation—premeditation. You heard the Defendant say I shot him when he was asked about what happened to Chris."

The jury found Becker guilty of first-degree premeditated murder. At sentencing, the district court granted a downward departure from a sentence of lifetime imprisonment with no chance of parole for 50 years (hard 50), to lifetime imprisonment with no chance of parole for 25 years (hard 25). The sentencing court also imposed lifetime postrelease supervision.

7

Becker's appeal brings the matter before us. This court has jurisdiction over Becker's direct appeal under K.S.A. 2018 Supp. 22-3601(b)(3), (4) (life imprisonment, off-grid crime).

## ANALYSIS

*The prosecutor's statements in closing argument do not constitute prosecutorial error.*

Becker contends the prosecutor's statements regarding what happened to Sosa and Schmidt and "what they pled to or didn't plead to" require reversal and a remand for a new trial.

### *Standard of Review*

We follow the analytic protocol stated in *State v. Sherman*, 305 Kan. 88, 378 P.3d 1060 (2016), in evaluating claims of prosecutorial error:

> "Appellate courts will continue to employ a two-step process to evaluate claims of prosecutorial error. These two steps can and should be simply described as error and prejudice. To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801, (2011), *cert. denied* 565 U.S. 1221 (2012). We continue to acknowledge that the statutory harmlessness test also

applies to prosecutorial error, but when 'analyzing both constitutional and nonconstitutional error, an appellate court need only address the higher standard of constitutional error.' [Citation omitted.]" 305 Kan. at 109.

*Discussion*

Becker claims the prosecutor's statements regarding Sosa and Schmidt during closing argument were prosecutorial error. He contends their plea agreements were crucial to the jury's weighing the credibility of Sosa and Schmidt. And so, by stating "what they pled to or didn't plead to" was not part of the case, the prosecutor misstated the law and told the jury not to consider the plea agreements in weighing Sosa's and Schmidt's credibility. Likewise, he argues that when the prosecutor stated, "It does not matter what happened to James Schmidt or Chelsea Sosa as far as their charges in this case," the prosecutor made similar misstatements of law.

The first step in analyzing prosecutorial error is for us to decide whether the prosecutor's comments were outside the wide latitude allowed in discussing the evidence. 305 Kan. at 104 ("The well-developed body of caselaw defining the scope of a prosecutor's 'wide latitude' is likewise sound and will continue to inform our review of future allegations of prosecutorial error."). Obviously, misstating the law is not within the wide latitude given to prosecutors in closing arguments. *State v. Pribble*, 304 Kan. 824, 833, 375 P.3d 966 (2016). Inquiry into whether the witness was offered any arrangement or deal by the State in exchange for her testimony is crucial. *State v. Davis*, 237 Kan. 155, 158, 697 P.2d 1321 (1985). Thus, if the prosecutor instructed jurors to not consider plea agreements when weighing witness credibility, then the prosecutor committed error.

In determining whether a particular statement falls outside of the wide latitude given to prosecutors, the court considers the context in which the statement was made, rather than analyzing the statement in isolation. *State v. Ross*, 310 Kan. 216, 221, 445 P.3d 726 (2019).

Taken in context, the prosecutor's argument in rebuttal, though inartfully expressed, did not direct the jury to ignore the plea agreements or to give them no weight in determining witness credibility. After all, the court had just instructed the jurors that they were to "consider and weigh everything admitted into evidence." Instead, it is apparent that the prosecutor was rebutting the attacks against Sosa—and, by inference, also against Schmidt—made by Becker's counsel in his closing argument regarding Sosa's favorable plea agreement. In essence, the prosecutor's rebuttal argued that Becker's videotaped confession to the crime and his letter of apology rendered the plea deals received by Sosa and Schmidt effectively immaterial. In other words, if the jury chose to totally disregard the testimony of Sosa and Schmidt, the State still had proven Becker's guilt beyond a reasonable doubt through his own recorded words—the voluntariness of which, we note, has not been challenged on appeal. The prosecutor's argument did not fall outside the wide latitude afforded prosecutors to conduct the State's case and was not an attempt to obtain a conviction in a manner that offended Becker's right to a fair trial.

Based upon this conclusion, we need not address the State's argument regarding where the burden of proof should be placed when deciding whether Becker was prejudiced by the State's argument.

*The district court did not commit reversible error under K.S.A. 2018 Supp. 22-3414 by failing to instruct the jury on the lesser included offenses of second-degree murder and voluntary manslaughter.*

*Standard of Review*

Kansas appellate courts follow a three-step protocol for reviewing challenges to jury instructions: (1) we determine whether we can or should review the issue; that is, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) we consider the merits of the claim to determine whether error occurred

10

below; and (3) we assess whether the error requires reversal or whether the error was merely harmless. *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018) (quoting *State v. Williams*, 295 Kan. 506, 510, 286 P.3d 195 [2012]).

Even when an offense includes a lesser crime and is, therefore, legally appropriate, failure to instruct on the lesser included crime is erroneous only if the instruction also would have been factually appropriate under K.S.A. 2018 Supp. 22-3414(3). See *State v. Walker*, 308 Kan. 409, 425, 421 P.3d 700 (2018); *State v. Molina*, 299 Kan. 651, 661, 325 P.3d 1142 (2014). An instruction on a lesser included crime is factually appropriate if there is "'sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction.'" *State v. Chavez*, 310 Kan. 421, 430, 447 P.3d 364 (2019) (quoting *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 [2012]). If an instruction on a lesser included crime would have been legally and factually appropriate, the failure to give the instruction constitutes error. See *State v. James*, 309 Kan. 1280, 1300, 443 P.3d 1063 (2019).

*Discussion*

Becker requested both second-degree murder and voluntary manslaughter instructions. Becker argued the instructions were warranted because they were lesser included offenses of first-degree premeditated murder. Becker preserved the lesser included instruction issue for our review, so the first step of our analysis is satisfied.

The second step is determining whether it was error not to give these lesser included instructions. Jury instructions on second-degree murder and voluntary manslaughter were legally appropriate in Becker's trial because they are lesser included offenses of first-degree premeditated murder. *James*, 309 Kan. at 1298. Therefore,

11

resolution of this issue turns on whether these lesser included instructions were factually appropriate and, if so, whether failure to instruct on these lesser included crimes requires reversal.

*Second-Degree Intentional Murder Instruction*

We first turn to Becker's proposed but rejected second-degree intentional murder instruction. If we assume—without deciding—that the evidence presented at trial factually supported the giving of a second-degree intentional murder instruction, then the issue becomes whether the error in failing to give this lesser included instruction requires reversal.

Becker's challenge necessitates the application of the nonconstitutional harmless error test set forth in *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011); see *State v. Ross*, 310 Kan. 216, 223, 445 P.3d 726 (2019); *Plummer*, 295 Kan. at 168. Under this test, the court must be persuaded that there is no reasonable probability that if the jury had been instructed on the lesser included offense, it would have found Becker guilty of second-degree intentional murder. *Ward*, 292 Kan. at 565.

The only difference between second-degree intentional murder and first-degree premeditated murder is the added element of premeditation in a first-degree murder charge. See *State v. Haberlein*, 296 Kan. 195, 204, 290 P.3d 640 (2012). Here, there was no evidence presented upon which a reasonable juror could conclude that Becker murdered Boyd without premeditation. Becker apologized to Boyd's family for the crime, stating: "I wish there could have been another way but I did what I needed to do to protect the woman that is my world." His motive was to prevent Boyd from prostituting Sosa in order to obtain money for drugs. He carried out this objective by telling Boyd that money for drugs could be found in a shed on his parents' property, but Becker would need Boyd's help to get it. On the way to the shed Becker picked up a gun which he knew

12

was loaded. Once he and Boyd were at the back of the shed, Becker fired 10 shots at Boyd, striking him 6 times. When Boyd fell to the ground, Becker stomped on his head to make sure he was dead.

Given these facts, there was no reasonable probability that a rational juror would have found that Becker's murder of Boyd was anything other than premeditated. We are satisfied that any error in failing to give an instruction on second-degree murder had no effect on the jury's verdict in this case. *State v. Salary*, 301 Kan. 586, 600, 343 P.3d 1165 (2015); *State v. Killings*, 301 Kan. 214, 224, 340 P.3d 1186 (2015).

*Voluntary Manslaughter Instruction*

Next, we turn to Becker's argument regarding the district court's failure to instruct on voluntary manslaughter. Becker argues that a voluntary manslaughter instruction was factually appropriate because the jury could have believed "the killing was not a cold, premeditated murder, but one done in the heat of passion after the trio quarreled about how to get drug money." Becker characterizes this as a "sudden" quarrel. The facts disclose otherwise. After the dispute over how to obtain drug money, Becker lied to Boyd about money they could get from a shed on the property at Becker's parents' house. They traveled to Becker's parents' house in rural Ford County for that purpose. It was there that Becker obtained the loaded gun and lured Boyd to the shed for the specific purpose of murdering him. A sudden quarrel involves an "unforeseen angry altercation, dispute, taunt, or accusation." *State v. Johnson*, 290 Kan. 1038, 1048, 236 P.3d 517 (2010). There was no sudden quarrel here to support an instruction for voluntary manslaughter. The district court did not err in failing to give this instruction.

*Becker's Newly Raised Constitutional Issue*

As a final point regarding these requested instructions, Becker argues, for the first time on appeal, that the district court's refusal to give these lesser included offense instructions violated his right to a jury trial and his right to due process under the U.S. Constitution. These claims are predicated on the assertions that in denying lesser included instructions the district court engaged in fact-finding that preempted the function of the jury and that the lack of a lesser included alternative required the jury to render an all or nothing verdict in violation of Becker's due process rights.

The general rule is that claims of error raised for the first time on appeal, even if based on constitutional grounds, are not properly before the reviewing court. *State v. Williams*, 295 Kan. 506, 517, 286 P.3d 195 (2012). But an appellate court may address an issue for the first time on appeal if the issue meets one of our preservation exceptions. *State v. Patterson*, 311 Kan. 1122, 455 P.3d 792 (2020). Here, Becker argues that his claim is preserved because it meets our exception allowing newly asserted claims involving only questions of law on proved or admitted facts that are determinative of the case. See *State v. Ortega-Cadelan*, 287 Kan. 157, 159, 194 P.3d 1195 (2008). In this instance, we decide to consider his claim.

In *Beck v. Alabama*, 447 U.S. 625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980), the court held that Alabama was constitutionally prohibited from eliminating the jury's option of convicting a defendant in a capital case of a lesser included offense. 447 U.S. at 637-38. But the *Beck* Court declined to decide whether to extend this prohibition to trials in noncapital cases. 447 U.S. at 638 n.14.

Following *Beck*, this court in *State v. Love*, 305 Kan. 716, 729-30, 387 P.3d 820 (2017), rejected a similar claim, concluding that the statutory elimination of all lesser included offenses for felony murder found in K.S.A. 2015 Supp. 21-5109(b)(1) did not

14

violate due process. "Unlike the statutory scheme in *Beck*, the Kansas lesser-included-offense statute does not create a 'capital specific artificial barrier to the provision of instructions on offenses that actually are lesser included offenses under state law'—felony murder is not a capital offense." 305 Kan. at 734. Consistent with the analysis in *Beck* and *Love*, we find no merit in Becker's due process claim.

A criminal defendant's right to a jury trial is protected by the Sixth Amendment to the United States Constitution. Similarly, Section 5 of the Kansas Constitution Bill of Rights states: "The right of trial by jury shall be inviolate." Becker's jury trial argument was asserted earlier in the context of Kansas constitutional law by the defendant in *Love*. There, the court held that "[w]hether to give lesser included instructions is squarely in the court's domain, rather than the jury's." 305 Kan. at 736. Moreover,

> "We hold that the legislature's statutory elimination of lesser included offenses of felony murder does not implicate Section 5. Although a defendant has a right under Section 5 to have a jury determine his guilt of the charged crime in a felony prosecution, determining what additional crimes upon which the jury should be instructed as lesser included offenses is a matter of law for the court." 305 Kan. at 736-37.

The United States Supreme Court has not come to a contrary conclusion with respect to the Sixth Amendment's protection of the right of a criminal defendant to trial by jury. But the Sixth Circuit has addressed the issue and has arrived at the same conclusion as the court did in *Love*: "Whether to give lesser included instructions is squarely in the court's domain." 305 Kan. at 736; see *McMullan v. Booker*, 761 F.3d 662, 669 (6th Cir. 2014) ("The jury-trial right does not prohibit judges from declining jury instructions on lesser included offenses in non-capital cases."). Based on this analysis, we are not convinced that the district court's failure to instruct on claimed lesser included crimes violated Becker's constitutional right to a trial by jury.

15

*The district court did not err in failing to give a voluntary intoxication jury instruction.*

Becker requested the voluntary intoxication instruction from PIK Crim. 4th 52.060, patterned after K.S.A. 2014 Supp. 21-5205(b). That statute provides:

> "An act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind." K.S.A. 2014 Supp. 21-5205(b).

Becker objected to the district court's decision not to give this instruction. The objection properly preserved the issue for our review. K.S.A. 2018 Supp. 22-3414(3). A district court's failure to give a voluntary intoxication instruction is subject to harmless error review. *State v. Moore*, 287 Kan. 121, 134, 194 P.3d 18 (2008).

Evidence of consumption of an intoxicant near the time of the commission of the crime does not automatically render the voluntary intoxication instruction mandatory. *State v. Reed*, 302 Kan. 390, 400, 352 P.3d 1043 (2015). A voluntary intoxication instruction is not required unless "the State or the defendant presents sufficient evidence showing intoxication to the extent of impairing the ability to form the requisite intent." *State v. Betancourt*, 299 Kan. 131, 141, 322 P.3d 353 (2014). "'This court will not infer impairment based on evidence of consumption alone.'" *State v. Hilt*, 299 Kan. 176, 193, 322 P.3d 367 (2014). "Loss of memory or inability to remember events before or during the offense may show an inability to form intent." *Betancourt*, 299 Kan. at 141. "'Evidence that the defendant is so impaired that he or she has lost the ability to reason, to plan, to recall, or to exercise motor skills as a result of voluntary intoxication' can compel a jury instruction." *Reed*, 302 Kan. at 400.

16

First-degree premeditated murder is defined as "the killing of a human being committed: (1) [i]ntentionally, and with premeditation." K.S.A. 2018 Supp. 21-5402(a). A person acts intentionally "when it is such person's conscious objective or desire to engage in the conduct or cause the result." K.S.A. 2018 Supp. 21-5202(h). The court instructed the jury that premeditation

"means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous intentional act of taking another life."

Becker argues there was ample evidence of methamphetamine consumption presented at trial. The evidence establishes that Sosa, Becker, and Boyd had smoked methamphetamine that night. But there is nothing to indicate how much time elapsed between Becker's meth consumption and the shooting. Moreover, Becker presented no direct evidence that he was intoxicated at the time of the shooting. There was no evidence that his motor function was impaired. His ability to plan had not been impaired. He systematically brought Boyd to his parents' house and then to their shed with the specific intent to murder him. He accomplished the deed by obtaining from a bureau drawer a pistol which he knew was loaded. He did so in a fashion that did not alert Boyd to what was about to happen. Sosa described the shed as a "good distance" from the house. She testified that it took "a couple minutes" to walk from the house to the shed. After murdering Boyd, Becker apologized to Boyd's family, saying "I did what I needed to do to protect [Sosa]."

As stated in *State v. Davis*, 306 Kan. 400, 414-15, 394 P.3d 817 (2017): "A defendant's ability to recall the circumstances surrounding the charged crime and provide a coherent narrative of his or her conduct undercuts a claim of intoxication sufficient to warrant a jury instruction." Here, Becker provided police with a detailed and cogent

17

explanation of how he killed Boyd. The evidence relied upon by Becker, viewed in a light most favorable to him, establishes consumption but not intoxication to the extent that his ability to form the requisite intent was impaired. *Hilt*, 299 Kan. at 193.

As a final point on this issue, Becker argues that, at his sentencing hearing, one of the district court's reasons for a downward departure sentence established that the district court should have instructed the jury on voluntary intoxication at trial.

The court's journal entry of judgment, in the space for reasons cited as basis for departure, states: "Court finds defendant's lack of criminal history and ability to appreciate impaired by drug use substantial and compelling as mitigating factors." But in the space for the court's additional comments, the court stated: "Defendant's ability to appreciate impaired by drug use. Court found defendant's extreme distress due to drug use is compelling but not substantial."

At sentencing the district court heard unsworn statements from Becker's parents. His mother, Kathy Becker, told the court that "when Tony got on meth, he changed. Not so much as that you'd notice, but he changed. It's only afterwards that I can—I can see it." She did not provide any information that would indicate a mental impairment at the time of the crime that would have warranted a voluntary intoxication instruction. Phillip Becker, Becker's father, told the court his son was not violent. "What happened in the six months prior to Chris' death, I don't—I didn't see it. . . . His teachers, we talked to them, they said there was no violence in him. I don't know what happened." These were the only statements related to Becker's mental state or his drug use.

None of this was presented at trial. Neither of Becker's parents testified at trial. Their statements at the sentencing hearing do not establish a level of impairment at the time of the crime that would have warranted a voluntary intoxication instruction. In response to this new information, the court told Becker, "[M]aybe you can make an

18

argument that the meth and the extent that it changed you is some evidence to support the extreme distress. But, I, again, don't find it's substantial and compelling, because it was a voluntary action." The court did not find that Becker's habitual methamphetamine use impaired his ability to appreciate the criminality of his actions in murdering Boyd or detracted from the evidence of premeditation.

The district court did not err in failing to instruct on voluntary intoxication.

*There was no cumulative error.*

Relief from an accumulation of trial errors is predicated on a showing of substantial prejudice that resulted in the denial of a fair trial. In assessing the cumulative effect of errors during trial, the appellate court examines the errors in the context of the entire record, considering how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014); see also *State v. Walker*, 304 Kan. 441, 457-58, 372 P.3d 1147 (2016).While a single error standing alone may not warrant a new trial, the cumulative effect of multiple errors may do so. To invoke the doctrine of cumulative error, there must be multiple errors to accumulate. *State v. Gonzalez*, 307 Kan. 575, 598, 412 P.3d 968 (2018).

Here, we assumed, without deciding, that the evidence presented at trial supported the giving of a second-degree intentional murder instruction. If we consider the failure to give that instruction to have been an error, the result is one harmless error and not multiple errors that can be accumulated for purposes of a cumulative error analysis. As Becker has demonstrated no other errors, there was no cumulative error in his trial.

19

*The district court erred in ordering lifetime postrelease supervision.*

Becker was sentenced to a hard 25 life sentence to be followed by lifetime postrelease supervision. Becker contends the lifetime postrelease supervision portion of his sentence was illegal.

*Standard of Review*

Whether a sentence is illegal within the meaning of K.S.A. 22-3504 is a question of law over which we have unlimited review. *State v. Lee*, 304 Kan. 416, 417, 372 P.3d 415 (2016). Though the issue of lifetime postrelease supervision was not raised below, if the imposition of lifetime postrelease supervision results in an illegal sentence, that error can be corrected at any time. K.S.A. 2018 Supp. 22-3504.

*Discussion*

Both Becker and the State agree that Becker is not subject to postrelease supervision. A sentencing court has no authority to order a term of postrelease supervision in conjunction with an off-grid, indeterminate life sentence. *State v. Edwards*, 309 Kan. 830, 835, 440 P.3d 557 (2019). Defendants such as Becker sentenced under K.S.A. 2018 Supp. 21-6620(c)(2)(A) "shall not be eligible for parole prior to serving 25 years' imprisonment." The district court erred in imposing a term of postrelease supervision rather than parole. The improper imposition of lifetime postrelease supervision can be vacated, allowing the district court to correct the judgment without the need for further proceedings. K.S.A. 60-2106(c); *State v. Johnson*, 309 Kan. 992, 997-99, 441 P.3d 1036 (2019); *State v. Phillips*, 309 Kan. 475, 478, 437 P.3d 961 (2019); K.S.A. 2018 Supp. 22-3504(1) (correction of sentence); *State v. Breeden*, 297 Kan. 567, 593, 304 P.3d 660 (2013) (directing district court to enter nunc pro tunc order).

The district court's order for lifetime postrelease supervision is vacated.

The conviction is affirmed; the portion of his sentence ordering lifetime postrelease supervision is vacated.

PATRICK D. MCANANY, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** Senior Judge McAnany was appointed to hear case No. 118,235 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Justice Lee A. Johnson.