NOT DESIGNATED FOR PUBLICATION

No. 122,203

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of B.P.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Sherman District Court; SCOTT SHOWALTER, judge. Opinion filed December 18, 2020. Affirmed.

*Razmi M. Tahirkheli*, of Tahirkheli & Premer-Chavez Law Office, L.L.C., of Kansas City, for appellant natural father.

*Charles F. Moser*, county attorney, and *Leslie C. Beims*, guardian ad litem, for appellee.

Before GARDNER, P.J., BUSER and BRUNS, JJ.

PER CURIAM: Father appeals the termination of his paternal rights to his child B.P., arguing that his due process rights were violated because he was not present for the termination hearing. Father also contends the district court erroneously relied on his incarceration as the sole reason to declare he was unfit to parent B.P. Finding no error, we affirm.

*Father's Incarceration*

Father was incarcerated for a short time beginning in May 2016 after police raided his home and found drugs and loaded firearms within the reach of his children. The raid prompted the State to file a child in need of care (CINC) petition for the children in

1

Father's care at that time. B.P. was not yet born. Father was released from custody on an unsupervised bond after serving only a couple of months in jail.

In April 2018, Police raided Father's home again based on allegations that he was selling methamphetamine. It is unclear what was recovered from this second raid, but as a result of the raid the State charged Father with new crimes in two cases. Although both cases were dismissed, Father was convicted of a federal firearm offense shortly after the 2018 raid. Father was sent to serve a federal prison sentence in Springfield, Missouri in July 2018. His earliest expected release date is in October 2022.

*CINC Proceedings*

When B.P. was born in June 2016, both she and Mother tested positive for methamphetamine and marijuana. The State swiftly filed a CINC petition, asking the district court to remove B.P. from the home. The district court notified the parties of a hearing, held a hearing, and placed B.P. into the Kansas Department for Children and Families' (DCF) temporary custody when she was four days old.

The next month, Mother stipulated to the allegations in the CINC petition. The district court adjudicated B.P. as a CINC and approved a permanency plan with the goal of reintegration. Under that case plan, Father was required to accomplish many tasks. Some of those tasks were to have a legal source of income, to participate in parenting classes, to participate in individual therapy, to maintain suitable housing, and not to receive new criminal charges.

For the next two and one-half years, Father tried to work through his case plan to regain custody of B.P. However, Father's efforts were described as "reluctant" and were ultimately unsuccessful.

*Termination Proceedings*

In December 2018, Mother voluntarily relinquished her parental rights to B.P. The same day, the district court found reintegration with Father was no longer viable and granted the State's motion to modify the permanency plan from reintegration to adoption. The district court continued the case for a termination hearing to determine whether Father's parental rights should be terminated.

The State moved to terminate Father's parental rights, arguing Father was unfit and could not remedy his situation within a reasonably foreseeable future. The motion rested in large part on Father's incarceration as the primary barrier to reintegration. The State also argued that Father failed to carry out a reasonable reintegration plan because:

- Father was incarcerated in a federal prison with an expected release date of October 22, 2022;
- he did not have a legal source of income;
- he had not participated in parenting classes;
- he had not participated in or completed individual therapy;
- he failed to maintain suitable housing; and
- he received new criminal charges.

The State also alleged that B.P. had been out of the home for more than two years, and that Father had not seen B.P. since June 13, 2018. The State's motion also claimed that Father had not formed a parent-child bond with B.P. and would not do so in the foreseeable future because of Father's imprisonment.

On December 31, 2018, the court sent Father a notice of a termination hearing on March 26, 2019. Father does not dispute that he had proper notice of this hearing. But

Father did not attend the hearing because he was still in Springfield, Missouri serving his federal sentence.

*The Motion for a Continuance*

The day before the hearing, Father's attorney, Steve Cott, requested a 90-day continuance to allow Father to be present. The record does not show that Father asked to be temporarily released from prison and transported to the termination hearing. Nor does it show that Father ever asked to participate in the hearing by telephone or other virtual means. Instead, Father asked Cott on some day not specified in the record to request a 90-day continuance. Cott told the district court that he had known for "a while" that Father wanted a continuance but that he had trouble communicating with Father because of the federal government's mail system.

Cott did not know the specific reasons that Father wanted a continuance until the morning of the hearing when Father's family gave Cott Father's handwritten explanation. In that handwritten letter addressed to the district court—which the court admitted into evidence as Defendant's Exhibit A—Father argued that he needed a 90-day continuance because he hoped to get a compassionate release from federal prison to care for his children and work toward reintegration. Father wrote that he believed he would be released from prison based on the "unforeseeable circumstances" of Mother having relinquished her parental rights, leaving him as the only person to prevent the adoption of his children and the termination of his parental rights. Father also claimed that within 30-45 days he would likely be moved to Englewood, Colorado, which is several hours closer to Goodland, Kansas, where the termination hearing was held. Father attached a copy of his handwritten request for compassionate release from prison. It was addressed to the warden of the prison and noted, apparently in Father's handwriting, that the letter had been sent to the Bureau of Prisons and to "F.A.M.M. ORG" and should be approved or denied within 90 days.

Both the State and guardian ad litem objected to Father's motion for a continuance, arguing that the prison was unlikely to grant Father's compassionate release request. The guardian ad litem stressed the need for B.P. to establish some form of permanency. The State argued that Father's request would likely be denied because Father had a criminal history which included around 17 prior felony convictions. But Father's stepdaughter was present and she denied that Father had that many previous convictions. She spoke with Cott who told the district court that Father may have had only four prior convictions.

The district court gave Father the benefit of the doubt, assuming that Father had only four priors, but it still denied Father's request for a continuance and conducted the termination proceeding without him:

> "I have had the opportunity to review [Father's] documents along with the arguments as presented by counsel and it would seem that at this time since we are unable to, with any assurance, know that [Father] will be getting out of the federal penitentiary, whether it's because of the 4th conviction or 18th, presumably not the 18th. I'm going to rely on the assumption that there were four, I don't feel comfortable with leaving an open date, whether it be 90 days or whatever. And under those circumstances the defense'[s] request to continue this matter is denied."

*The State's Evidence*

The State presented testimony from Sunee Creighton, Saint Francis Community Services (SFCS) family support worker, and Cherish Seifert, SFCS permanency specialist, that Father failed to carry out a reasonable reintegration plan and would be unable to do so in the foreseeable future, mostly because of his continued incarceration. The testimony showed that Father failed to complete several case plan tasks. Specifically, Father failed to participate in a parenting class, a 12-step treatment program, and individual therapy sessions. Father also failed to maintain suitable housing, to provide

evidence that he was making an income through legal means, to refrain from using drugs and alcohol, and to avoid incurring new criminal charges.

Some of the testimony supporting these allegations, however, was unclear and somewhat contradictory. First, Creighton conceded that it was not Father's fault that he did not complete a parenting class before he was incarcerated because one was unavailable to him. And Father provided evidence that parenting classes in his facility were available for women but not for men. Still, Siefert testified that SFCS had referred Father to a parenting class. Second, Father's housing was considered suitable for most of the time, as the home became suitable within a couple of weeks after SFCS's initial walkthrough, and Father was allowed unsupervised visits and one unsupervised overnight visit with B.P. at his home. It was not until April 2018 that Father's home was unsuitable for visitation purposes. According to Creighton, the 2018 police raid left Father's home with broken windows and doors that remained unrepaired. Third, before Father was sent to prison in July 2018, he notified Creighton that he was employed. But Father did not provide Creighton with any pay stubs to verify that claim. Fourth, although Father's home was raided in April 2018 based on a report that Father was selling methamphetamine, the State produced no evidence that Father was selling drugs or that police found any drugs in his home. In fact, it is unclear from the record what, if anything, was recovered during that raid or what the State charged Father with after that raid. Finally, although Father incurred new criminal charges after the 2018 raid, those charges were dismissed.

Regardless of this somewhat conflicting testimony, the State clearly established that Father did not complete his case plan tasks. For example, the record is clear that Father was charged with new crimes, even if they were dismissed. That violated his task to "[a]void receiving new criminal charges." The State also established that Father used drugs and alcohol throughout the pendency of this case. Seifert testified that Father tested positive for alcohol in April 2017 and admitted to using methamphetamine in July 2017.

6

Then in August 2017 and January 2018, Father tested positive for using methamphetamine. And B.P. was in Father's care on the latter date.

The State also presented testimony about Father's mental health and the lack of a bond between B.P. and Father. Seifert testified that Father's psychological evaluation raised significant concerns that Father could not act as a "responsible parent" or as "a member of society who is capable of complying with rules and expected regulations." According to Father's psychological evaluator, Father exhibited symptoms of anti-social personality disorder that would cause him to "lack the needed empathy and compassion to raise a child effectively." Creighton testified that Father progressed from supervised visits to five-hour long unsupervised visits and finally to the one unsupervised overnight visit. The overnight visit was, however, interrupted by the 2018 police raid of Father's home. And because Father was sent to serve his federal prison sentence, B.P. had not seen Father for around six months as of the termination hearing. Based on these interactions, Creighton testified that B.P. and Father had a good relationship but had not formed a typical father-daughter bond.

Both Creighton and Seifert supported the termination of Father's parental rights and testified that termination would be in B.P.'s best interests.

*Father's Evidence*

Cott cross-examined both of the State's witnesses. Cott argued that even though Father had a contentious relationship with SFCS, Father had completed at least some of his case plan tasks. Cott also relied on Father's written statement and alleged that Father had been blind-sided by Mother's voluntary relinquishment because she had worked with Father in completing their reintegration tasks. And Father had believed that Mother could care for B.P. while he was incarcerated. Creighton's testimony established that Father had fairly regularly attended visits with B.P. until his incarceration in June 2018. And

7

Creighton testified that Father resumed visits with B.P. during the month he was released on bond pending trial for his federal crime.

Cott also showed that Father was trying to complete some of his case plan tasks while in prison. Creighton admitted that although she had received no supporting documentation, Father had told her he had asked to enroll in parenting classes and in drug and alcohol classes while in prison. So Cott argued that Father should be granted more time to keep working toward reintegration.

Father's stepdaughter testified on his behalf. She asserted that Father cared for his children and that termination could be potentially harmful to B.P.

Although Father was not present, he managed to relay some of his own substantive arguments against termination through his written statement submitted to the district court. Father conceded that his prison release date was October 22, 2022, and that he had a history of using drugs. But he argued that his release date could change because the "First Step Act" had recently been "signed into law" and would take effect in less than six months. Father also outlined which reintegration tasks he had completed and argued that the State's motion had erroneously listed some tasks as incomplete. Father argued that he had always had a legal source of income and that he regularly attended individual therapy sessions. Father also acknowledged that he had received new criminal charges but argued that because the charges had been dropped, they should not count against him.

*The District Court's Decision*

At the close of the hearing, the district court found by clear and convincing evidence that Father was unfit "by reason of conduct or condition which renders the person unable to care properly for the child and is unlikely to change in the foreseeable future." The court based that conclusion on multiple reasons, including Father's

8

conviction of a felony and imprisonment. K.S.A. 2019 Supp. 38-2269(b)(5). The district court explained:

> "[T]he bottom line is, when the child is out of the home it needs the parents to step forward and do whatever is necessary and that is not [the] case here.
>
> . . . .
>
> "I rely upon many factors in making that determination, specifically including, but not necessarily limited to any one of these:  That there is no legitimate bond between the child and that of the father. That the father's behavior has not been conducive to trying to get through the reintegration in a timely fashion. That he has in effect only had the child for a period of some five hours over the course of 31 months. That he stopped attending AA voluntarily on [h]is own part in December until he had gone into federal treatment. He has in fact been caught using alcohol. That he has severe and substantial criminal convictions in felony federal court, including four prior presumed federal convictions. He failed to work his alcohol and drug treatment program prior to attending prison."

Thus the district court terminated Father's parental rights.

Father appeals.

*Was Father Afforded Due Process?*

Father asserts for the first time on appeal that his due process rights were violated when the district court denied his motion for a continuance and held his termination hearing without him present. Although Father moved for a continuance the day before trial so he could be present, he never argued to the district court that denying his motion would violate his due process rights. Compare *In the Interest of J.L.D.*, 14 Kan. App.2d 487, 489, 794 P.2d 319 (1990) (Appellant's attorney objected to proceeding with the

hearing in Father's absence on the grounds that constitutional due process required his presence at the hearing).

As a general rule, we do not review constitutional grounds for reversal raised for the first time on appeal. See *State v. Becker*, 311 Kan. 176, 186, 459 P.3d 173 (2020). But there are several exceptions to this rule, including: (1) the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent the denial of fundamental rights; and (3) the judgment of the district court may be upheld on appeal despite its reliance on the wrong ground or having assigned a wrong reason for its decision. *State v. Patterson*, 311 Kan. 59, 62, 455 P.3d 792 (2020).

To invoke an exception to the general rule, Kansas Supreme Court Rule 6.02(a)(5) (2020 Kan. S. Ct. R. 34) requires an appellant to explain why an issue was not raised below and to provide a reason why it should be considered for the first time on appeal. In *State v. Williams*, 298 Kan. 1075, 1085, 319 P.3d 528 (2014), the Kansas Supreme Court warned that an appellant who disregards this rule risks having the newly asserted argument considered to be waived or abandoned. And our Supreme Court has held that Rule 6.02(a)(5) is to be strictly enforced. See *State v. Hambright*, 310 Kan. 408, 420, 447 P.3d 972 (2019) (citing *State v. Godfrey*, 301 Kan. 1041, 1043-44, 350 P.3d 1068 [2015]).

Father has failed to comply with Rule 6.02(a)(5). First, he has failed to offer any explanation why he did not raise this issue below. Second, he has failed to provide a reason why we should consider this issue for the first time on appeal. Father's failure to present his due process argument to the district court deprived the parties of the opportunity to make a record establishing the facts essential to this issue and deprived the trial judge of the opportunity to weigh the necessary factors. Compare *In re J.L.D.*, 14 Kan. App. 2d at 491 (affirming the district court, "which balanced the child's rights, the

father's rights, and the State's rights and made the only reasonable decision possible—to proceed with the severance hearing"). Making a factual record and having the district court weigh the factors would have enabled and benefitted our review. Appellate courts are not courts of first resort—our role is not to make findings but merely to review those made by the district court. See *State v. Thomas*, 288 Kan. 157, 161, 199 P.3d 1265 (2009). We therefore find that Father has failed to preserve his constitutional issue for appeal and we consider this argument to be waived or abandoned.

But even if Father had sufficiently presented this constitutional issue to the district court and thus preserved this issue for appeal, we also find that Father raised his due process argument only incidentally on appeal. Father's constitutional argument on appeal is conclusory—he alleges only that his "termination without allowing him an opportunity to be heard" violates his constitutional rights.

And Father addresses none of the factors necessary to show a violation of his constitutional rights. See *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976); *In re J.D.C.*, 284 Kan. 155, 166-67, 159 P.3d 974 (2007). The only caselaw Father cites is *In re Adoption of B.J.M.*, 42 Kan. App. 2d 77, 209 P.3d 200 (2009), but he neither discusses nor analyzes that case. Rather, he cites *In re B.J.M.* solely for the proposition that his "due process rights are violated when he's not transported to [his] termination hearing." But that case does not create a bright-line rule that an incarcerated parent's due process rights are violated whenever the parent is not transported to a termination hearing. Instead, *B.J.M.* refutes the proposition that courts have broadly conferred upon each natural parent an unconditional and "'absolute right to be present at a severance hearing without regard to the particular circumstances in the individual case.'" 42 Kan. App. 2d at 83, quoting *In re J.L.D.*, 14 Kan. App. 2d 487 at 490. And the *B.J.M.* panel of this court read a previous case, *In re S.M.*, 12 Kan. App. 2d 255, 738 P.2d 883 (1987), as having done the same. 42 Kan. App. 2d at 83.

*In re B.J.M.* correctly found that the outcome in these cases depends on "the particular circumstances presented in its case." 42 Kan. App. 2d at 83. So for example, in *In re J.L.D.*, while recognizing that the loss of parental rights was "extremely important," the court found that, *under the specific facts presented*, the loss of parental rights was outweighed by "the loss by the child of the right to a prompt judicial determination of his status." 14 Kan. App. 2d 487 at 491. And *In re B.J.M.* underscored that "[i]n each case, the court readily conformed to the rule in Kansas that due process is flexible and calls for such procedural protections as the particular situation demands." 42 Kan. App. 2d at 84.

So here, to determine whether due process required the district court to transport Father to the termination hearing under the circumstances of this particular case, we would need to apply the balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). This test requires us to weigh these factors: (1) the individual interest at stake; (2) the risk of erroneous deprivation of the interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (3) the State's interest in the procedures used, including the fiscal and administrative burdens that the additional or substitute procedures would entail. *Winston v. Kansas Department of Social & Rehabilitation Services*, 274 Kan. 396, 409-10, 49 P.3d 1274 (2002). But Father fails to cite this prevailing test or its factors and Father made no effort to develop a factual record for these factors.

As for the first factor—the individual interest at stake—we can readily determine that Father has a fundamental liberty interest in the care, custody, and control of his child. See *In re J.D.C.*, 284 Kan. 155, 166, 159 P.3d 974 (2007). This interest "is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme Court]." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). That factor weighs in Father's favor.

12

But the last two factors of the required test are fact-specific and are based on facts we do not have. For example, the record fails to show the probative value of Father's 45-page letter to the court, whether that letter was an adequate substitute measure, to what extent, if any, Father could have helped Cott in cross-examining the State's witnesses, whether Father's presence at the termination proceeding posed any unique safety risk beyond those normally presented when a prisoner is transported for a hearing, what the expense of Father's transportation and safekeeping would be, and how those factors balanced against the child's interest in expediency. We cannot properly apply the last two parts of the governing test without the relevant facts.

Because Father has raised his due process argument on appeal only incidentally, we consider it abandoned. See *Russell v. May*, 306 Kan. 1058, 1089, 400 P.3d 647 (2017) (stating the rule for arguments made incidentally); *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 645, 294 P.3d 287 (2013) (finding appellant failed to support his due process argument with a factual record or legal authority and thus abandoned his due process issue on appeal) See also *In re A.J.S.*, No. 110,622, 2014 WL 902234, at *5 (Kan. App. 2014) (unpublished opinion) (applying the rule to an appellant who also cited only *In re B.J.M.* as support for her due process claim).

*Did the District Court Err in Denying Father's Motion for a Continuance?*

We review the district court's denial of Father's motion to continue for an abuse of discretion. *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008). A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) it is based on an error of law; or (3) it is based on an error of fact. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015). "'In ruling on a motion for continuance . . . a court must consider all circumstances, particularly such matters as the applicant's good faith, his showing of diligence, and the timetable of the lawsuit.'" *In re J.A.H.*, 285 Kan. 375, 385, 172 P.3d 1

13

(2007), quoting *Fouts v. Armstrong Commercial Distributing Co.*, 209 Kan. 59, 65, 495 P.2d 1390 (1972).

Our statutes provide that proceedings in CINC cases "shall be disposed of without unnecessary delay. Continuances shall not be granted unless good cause is shown." K.S.A. 2019 Supp. 38-2246. A request to continue a hearing on a motion to terminate parental rights "shall be granted only if the court finds it is in the best interests of the child." K.S.A. 2019 Supp. K.S.A. 38-2267(a).

When considering B.P.'s age and her time spent in DCF custody and viewing the 90-day continuance request in "child time," we find no abuse of discretion in the district court's decision. A reasonable person could share the view adopted by the district court, especially given the unlikelihood that Father would be granted compassionate or other release within the requested 90-day timeframe. And the decision was not based on an error of law or fact. See *Wiles*, 302 Kan. at 74. So we affirm the district court's denial of Father's motion for a continuance.

*Was the District Court's Decision to Terminate Father's Parental Rights Supported by Sufficient Evidence?*

Next, Father contends that the district court erroneously relied on his incarceration as the reason to "change [the] reintegration plan to a termination plan." On its face, Father's argument attacks only the district court's decision to change the case plan goal, which Father did not object to in the district court. But we broadly construe Father's argument as an insufficient evidence claim. Father asserts that the district court's decision was not sufficiently supported because it relied too heavily on Father's incarceration as cause to terminate his parental rights.

14

*Legal Principles*

The State may terminate the legal bonds between parent and child only upon "clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2019 Supp. 38-2269(a). If the district court makes such a finding, it must then consider whether termination is in the best interests of the child. The court's primary concern here is the physical, mental, and emotional health of the child. K.S.A. 2019 Supp. 38-2269(g)(1).

> "When this court reviews a district court's termination of parental rights, we consider whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the parent's right should be terminated." *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011).

In making this determination, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

K.S.A. 2019 Supp. 38-2269(a) provides that, once the district court has adjudicated a child as a CINC, the district court may terminate a parent's right by a finding of unfitness. K.S.A. 2019 Supp. 38-2269(b) contains a nonexclusive list of factors for the district court to consider when determining whether a parent is unfit. K.S.A. 2019 Supp. 38-2269(c) contains additional factors to consider when the child is not in the physical custody of a parent. Any one of the factors "standing alone may, but does not necessarily, establish grounds for termination of parental rights." K.S.A. 2019 Supp. 38-2269(f).

*Father fails to challenge the district court's alternative bases for its ruling*

The district court relied on several factors in denying Father's parental rights, including:

- Father's emotional illness, mental illness, mental deficiency or physical disability, rendered him unable to care for the ongoing physical, mental, and emotional needs of the child. K.S.A. 2019 Supp. 38-2269(b)(1).
- Father's use of intoxicating liquors or narcotic or dangerous drugs rendered him unable to care for the ongoing physical, mental or emotional needs of the child. K.S.A. 2019 Supp. 38-2269(b)(3).
- Father's conviction of a felony and imprisonment. K.S.A. 2019 Supp. 38-2269(b)(5).
- The failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family. K.S.A. 2019 Supp. 38-2269(b)(7).
- Father's lack of effort to adjust his circumstances, conduct or conditions to meet the needs of the child. K.S.A. 2019 Supp. 38-2269(b)(8).
- The child's extended stay in DCF custody for more than two years because of the parent's actions. See K.S.A. 2019 Supp. 38-2269(b)(9).
- Father's failure to assure care of the child in the parental home when able to do so. K.S.A. 2019 Supp. 38-2269(c)(1).
- Father's failure to maintain regular visitation, contact or communication with the child or with the custodian of the child. K.S.A. 2019 Supp. 38-2269(c)(2).
- Father's failure to carry out a reasonable plan approved by the court directed toward integrating the child into a parental home. K.S.A. 2019 Supp. 38-2269(c)(3).

16

Father challenges only one of these findings on appeal—the weight given to his conviction of a felony and imprisonment. But because Father fails to challenge the many other bases the district court relied on to support its ruling, we may dismiss Father's argument. See *National Bank of Andover v. Kansas Bankers Surety Co.*, 290 Kan. 247, 280, 225 P.3d 707 (2010). Dismissal on these grounds is particularly appropriate when, as here, the district court's ruling is based on a presumption of unfitness. See K.S.A. 2019 Supp. 38-2271. Although the district court did not specify which statutory subsection it was relying on when terminating Father's parental rights, its holding aligns with the statutory language found in K.S.A. 2019 Supp. 38-2271(a)(6). That statute creates a presumption of unfitness when: "The child has been in out-of-home placement, under court order for a cumulative total period of two years or longer; the parent has failed to carry out a reasonable plan to reintegrate the child; and there is a substantial probability that the parent will not carry out such plan in the near future." K.S.A. 2019 Supp. 38-2271(a)(6).

*The District Court Did Not Err in Considering Father's Incarceration.*

But even if we reach the merits of Father's argument that the district court weighed his incarceration too heavily against him, we find no basis for reversal. K.S.A. 2019 Supp. 38-2269(b)(5) requires the district court to consider whether a parent is convicted of a felony and imprisoned when determining unfitness. While imprisonment does not require automatic termination, "imprisonment for a felony alone can result in termination." *In re K.L.B.*, 56 Kan. App. 2d 429, 447, 431 P.3d 883 (2018); *In re M.H.*, 50 Kan. App. 2d 1162, 1171-72, 337 P.3d 711 (2014); *In re M.D.S.*, 16 Kan. App. 2d 505, 510, 825 P.2d 1155 (1992). To determine whether this factor should result in termination, the district court considers whether the parent's imprisonment is a mitigating factor or a negative factor. See *In re M.H.*, 50 Kan. App. 2d at 1171; *In re M.D.S.*, 16 Kan. App. 2d at 509-11. These considerations are case specific. See *In re M.H.*, 50 Kan. App. 2d at 1172.

17

Imprisonment may serve as a mitigating factor if it limits the parent's ability to fulfill their customary parental duties. See *In re S.D.*, 41 Kan. App. 2d 780, 789-90, 201 P.3d 1182 (2009). For example, "incarceration might be cause to excuse a parent's failure to complete certain tasks toward reuniting with a child." *In re M.H.*, 50 Kan. App. 2d at 1172. So we have recognized the district court's duty to consider an incarcerated parent's attempts to care for their children before terminating their parental rights. *In re S.D.*, 41 Kan. App. 2d at 789-90.

Other instances, however, justify consideration of imprisonment as a negative factor,

> "such as where it has impeded the development of a relationship between the parent and the child, where the parent has been incarcerated for the majority of the child's life and the child spent the time in the State's custody, and where the incarceration would cause further delay in the proceedings that isn't in the child's best interests." *In re M.H.*, 50 Kan. App. 2d at 1172.

Father presented the district court with some evidence that he was continuing his efforts to pursue reintegration while incarcerated. Creighton testified that Father claimed he had signed up for parenting and drug and alcohol classes since being imprisoned. Father had, however, received communication from prison staff denying his request to participate in parenting programs because they were offered only to female inmates. Father also wrote a letter to his warden requesting release based on a need to parent B.P. and his other children. And Father evidently maintained an interest in pursuing reintegration—or at least in maintaining his parental rights—as evidenced by his letter to the district court.

But these efforts do not necessarily outweigh the negative impact of Father's incarceration. And the district court, as the court properly equipped to weigh the evidence presented at trial, found that Father's incarceration was a negative factor here. Under the

applicable standard of review, we do not reweigh evidence but view the record in light most favorable to the State. *In re B.D.-Y.*, 286 Kan. at 705. The State presented evidence of B.P.'s young age, the fact she had lived her entire life in DCF custody, and the minimum of four years remaining on Father's federal prison sentence. Under these circumstances, we find no error in the district court's decision to weigh Father's imprisonment negatively.

Father's imprisonment provided an acceptable factual basis for the district court to find Father unfit to properly care for B.P. now and in the foreseeable future. It is unnecessary to find that it acted as the only or most significant basis for finding Father unfit because the district court relied on many factors in making its termination ruling and Father does not appeal those findings. Having reviewed all the evidence in the light most favorable to the State, we are convinced that a rational fact-finder could have found it highly probable that Father was unfit and would remain so for the foreseeable future.

Father does not appeal the district court's finding that termination was in B.P.'s best interests, and we see no abuse of discretion in that finding. See *In re R.S.*, 50 Kan. App. 2d 1105, 1115-16, 336 P.3d 903 (2014).

Affirmed.

19